15828

WHITE v. SOUTHERN RY. CO.
(38 S. E. (2d) 111)

*Messrs. Tompkins & Tompkins,* of Columbia, for Appellant,

*Mr. C. T. Graydon,* of Columbia, for Respondent, 

April 12, 1946.

MR. ACTING ASSOCIATE JUSTICE J. HENRY JOHNSON delivered the Opinion of the Court.

Plaintiff and his wife having moved to this State from Parkersburg, W. Va., in the summer of 1942, the former had shipped to himself at Columbia, on September 25 of that year, four trunks of household goods and personal effects, the bill of lading being signed by John Devlin Transfer Company, with whom the trunks had been stored for several weeks prior to their delivery to the Baltimore & Ohio Railroad Company, the initial carrier. On November 14, following, plaintiff had shipped to himself from Parkersburg his household furniture, the bill of lading in this instance being signed by his father-in-law, an attorney. The carrying charges were prepaid on both shipments. Upon arrival at Columbia, over appellant's line of railway, the contents of the

trunks had been damaged by water and a portion of the furniture was missing. Separate actions, tried together on circuit, and argued under one appeal in this court, were instituted in an effort to recover the alleged "full actual loss, damage, or injury to such property".

The evidence on behalf of plaintiff consisted in the main of the "Paid" freight bills given to him by appellant, which showed payment of the carrying charges on both shipments at the rate of $2.11 per hundred pounds, and that the four trunks, constituting the first shipment, weighed 415 pounds, while the furniture and household goods comprising the second shipment weighed 3,835 pounds; the testimony of Mr. and Mrs. Gordon White that certain articles of wearing apparel, household linen, etc., shipped in the trunks, were damp, mildewed, and damaged upon receipt, and that two large cartons of household goods, a portion of the second shipment, were lost in transit; that the damage to the articles in the "trunks case" amounted to $158.00, the sum sought to be recovered in that action, and that the actual value of the goods not delivered was not less than $1,076.26. Plaintiff did not offer the shipping orders, or bills of lading, nor any testimony as to the weight of the articles lost and damaged.

Appellant's evidence was made up of the bills of lading under which the shipments moved, the first being signed by John Devlin Transfer Company, as shipper, a storage concern with which the four trunks had been stored for several weeks prior to their delivery to the initial carrier, while the second was signed by Mrs. White's father, who handled the November shipment for plaintiff; the testimony of appellant's Travelling Freight Agent, who, for seventeen years was Chief Clerk to the Division Freight Agent; the depositions of the Rate Clerk of the initial carrier, Baltimore & Ohio Railroad Company; and the testimony of Appellant's Claim Clerk.

The appropriate blank spaces in each bill of lading were filled out with a pencil, with the exception of the rate ($2.11 per cwt. in each instance), the amount of the carrying

charges, and the words and figures "10¢" and "pound" in the "Agreed Value Clause" just above the signatures of the shippers, which words and figures were entered in ink, so that the "Agreed Value Clause" in one bill read: "The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding 10¢ per pound. John Devlin Tfr. Shipper", while the other was identical, except that it was signed "Harvey Marsh, Shipper".

The Rate Clerk for the initial carrier testified in substance that both bills of lading or shipping orders came to his hands after the goods had been weighed and the bills signed by the shippers; that he inserted the rate, filled out the "Agreed Value Clause" with a valuation of 10¢ per pound, calculated the carrying charges at $9.60 and $80.92, respectively, and then the Cash Clerk collected such charges from shippers. This witness also testified that the Devlin Transfer Company shipped large quantities of household goods, and that all of it, pursuant to a vague understanding to that effect, was shipped at a released valuation of ten cents per pound, unless he was informed that a higher valuation was desired. There was no testimony from any witness, or representative of the transfer company, to the contrary.

The plaintiff's father-in-law, who made the second shipment for Mr. White, testified to the effect that, when the various items of that shipment were weighed and listed on the Shipping Order, he signed the same as shipper, carried it upstairs to the rate clerk, who figured the amount to be paid, handed the papers to the cashier, to whom he was directed, and that he prepaid the carrying charges. The released valuation of 10¢ per pound had not been inserted in the Shipping Order when it left his hands, at least, he did not observe them, and he did not see the papers after he delivered them to the rate clerk, but he prepaid the freight charges after signing the bill of lading in blank, and after the rate clerk had calculated the same and handed the papers to the cashier. He further testified that he did not know it was necessary to declare a valuation, that such was not called to

his attention or discussed in any way, and that the first he knew of the valuation of ten cents per pound being in the papers was after the litigation was begun.

Other evidence on behalf of appellants, excerpts from tariffs filed with and certified by the Interstate Commerce Commission, indicated that $2.11 per hundredweight was the correct rate to charge for household goods shipped at a released valuation of ten cents per pound; that "Ratings on household goods apply only on second-hand (used) household or personal effects such as clothing, furniture, or furnishings for residences"; that "If consignor declines to release *each article* in the shipment to a value not exceeding $5.00 per lb., the shipment will not be accepted"; and that "The released value, *which shall be deemed to relate to each article separately and not to the shipments as a whole,* must be entered on shipping order and the bill of lading", the quoted words being from the tariff admitted in evidence.

There was other evidence from Appellant's Claim Clerk and from its Freight Agent, based on their experience in handling claims and shipments of goods, and uncontradicted in any respect, that the maximum weight of the articles damaged in the trunks could not have exceeded fifty-five pounds, and that the maximum weight of the goods lost in transit would have been 263 pounds.

During the presentation of its defense, appellant offered evidence by its witness, Anderson, then its Travelling Freight Agent, that, as Chief Clerk for seventeen years to the Division Freight Agent, his principal duty had been to "Check rates", and that he was familiar with the rates and tariffs of the railway company; but the trial judge refused to permit such witness to testify, either from his own knowledge, *or from the published tariffs of Appellant,* which he had with him, but which had not been certified by the Secretary of the Interstate Commerce Commission, to the substantive fact that there is more than one rate applicable to household goods, dependent upon the valuation placed thereon, or, expressed differently, that there

are alternative rates applicable to the shipment of household furniture and goods, based upon the value thereof; and testimony to the effect that there are four different rates applicable to such shipments, all based upon the valuation placed upon the goods, was stricken from the depositions of the witness, Duncan, Rate Clerk of the initial carrier at Parkersburg, W. Va., the rulings thereabout being predicated upon the suggestion that such fact could be proved only by copies of the schedules filed with the Interstate Commerce Commission, certified by its secretary; but the following testimony from the same witness was not objected to:

"Q. Did you figure the cost of transportation of that shipment?

"A. I did.

"Q. What was the cost of transportation?

"A. The total charges, $9.60.

"Q. How was that figured?

"A. It was figured on a rate of $2.11 per hundred on 415 pounds.

"Q. Is that the *minimum* rate for household goods?

"A. That is the minimum rate.

"Q. When that minimum rate is figured, what further notations are made on the shipping order?

"A. There is a declared valuation of 10¢ per pound shown.

"Q. And what is meant by that?

"A. *All household goods must be released at a stated valuation.*

"Q. Do I understand by that, that every shipment of household goods has *some* valuation placed on them by somebody?

"A. They have.

"Q. And in this case what valuation was placed on the goods that were shipped?

"A. 10¢ per pound.

"Q. Did you at that time have any standing instructions of any kind from the Devlin Transfer about valuations to be placed upon shipments of household furniture?

"A. Nothing in writing, an understanding, a vague understanding that all household goods shipped by them would be released at a valaution of 10¢ per pound.

"Q. Did the Railroad Company ship very much in the way of household goods from the Devlin Transfer Company?

"A. Yes.

"Q. And were all those shipments of household goods made on a released valuation of 10¢ per pound?

"A. I would say that they were, yes.

"Q. Were you ever asked in any case to make an exception and charge a higher rate for any shipments of household goods made by Devlin Transfer?

"A. *Very seldom.*"

The jury returned verdicts for plaintiff in the sums of $93.00 and $850.00, respectively.

Timely motions for directed verdicts for plaintiff, in sums based upon a valuation of ten cents per pound for the number of pounds of the shipments *actually lost or damaged,* and for judgments for plaintiff, *non obstante veredicto,* based upon the same valuation, were made by defendant, and refused; as were its motions for new trials, made upon the same ground, and also for alleged error in refusing to hold that plaintiff was bound by the terms of the bills of lading, in which was inserted an agreed or released valuation of ten cents per pound; in refusing to hold and to charge the jury that a shipper is charged with knowledge of the duly published tariffs of an interstate carrier; and in charging the jury, in effect, that plaintiff was not bound by the terms of the bills of lading.

The exceptions, thirteen in number, charge the same errors, and, in addition, complain of the instruction that "When property is tendered for shipment, it is presumed that the shipper desires to ship it unreleased, pay full freight charges, and collect for loss or damage full value", and of

the instruction that "Where a limitation as to the value has been agreed to, one is limited in his recovery to that amount specified if the entire shipment is lost or damaged. However, it would not be necessary to show the loss or damage to the entire shipment to that amount, but if any part of the shipment is lost and damaged to the extent of the full liability, the plaintiff could recover full liability for such as is lost or damaged if the loss or damage would equal that sum, and it is not what the proportionate value of any particular part of the shipment would bear to the total liability".

Appellant, in its brief, however, states that the exceptions raise four questions, viz.:

1. Was the Plaintiff bound by the released valuation in the bills of lading? (Exceptions 1, 2, 3, 4, 8, 9, 10, 11.)

2. Was there evidence that the plaintiff was offered a choice of rates? (Exceptions 5, 6, 7.)

3. Was it error to charge that the limitation as to value did not limit the plaintiff to a recovery for the proportion of the shipment lost, but that recovery could be had for the full weight of the entire shipment at the released valuation per pound, even though only a part of the shipment was lost or damaged? (Exception 13.)

4. Is there a presumption, under the provisions of the tariffs governing these shipments, that the shipper, unless there is an express agreement to the contrary, desires to send a shipment of household goods unreleased? (Exception 12.)

Respondent suggests that only two questions are involved, viz.:

1. Did Appellant prove, under the evidence in this case, that it came within the proviso of Title 49 U. S. C. A., Art. 20, Par. 11, permitting it to ship Respondent's goods at a released value?

2. Did Appellant prove, under the evidence in this case, that Respondent had entered into a written contract that his goods were to be shipped at a released valuation of ten cents per pound?

Until Congress legislated on the matter, liability for loss of property, on interstate as well as intrastate shipments, was subject to state regulation. Some states permitted an exemption by contract from all or a part of the common-law liability, others allowed no exemption. By the Carmack amendment, however, embodied in par. 11, *supra,* Congress legislated directly upon the liability of carriers for loss of and damage to goods moving in interstate commerce, and this and later federal ligeslation (first and second Cummins amendments) on the subject of interstate shipments is supreme and exclusive, and supersedes all state laws. *Adams Express Co. v. Croninger,* 226 U. S., 491, 33 Sup. Ct., 148, 57 L. Ed., 314. Or, as stated in *C. N. O. &. T. P. Ry. Co. v. Rankin,* 241 U. S., 319, 36 S. Ct., 555, 60 L. Ed., 1022, "The shipment being interstate, rights and liabilities of the parties depend upon acts of Congress, the bill of lading, and common-law rules as accepted and applied in Federal tribunals". Thus, "State laws or policy, nullifying contracts limiting the liability of a carrier for loss or damage to the agreed or declared value upon which the rate was based, are superseded so far as interstate shipments are concerned." *Washington Horse Exchange v. Louisville, etc., R. Co.,* 171 N. C., 65, 87 S. E., 941. And so this state's "Penalty Statute", subjecting the terminal carrier to a penalty for failure to pay within forty days claims for damage to interstate shipments, was invalidated by the decision of the Federal Supreme Court in *C. & W. C. Ry. Co. v. Varnville Furn. Co.,* 237 U. S., 597, 35 S. Ct., 715, 59 L. Ed., 1137, reversing 98 S. C., 63, 79 S. E., 700.

Hence, it was held by this court in *Aldrich v. Southern Ry. Co.,* 95 S. C., 427, 79 S. E., 316, that "No error in quoting a rate which has been filed with the Commission and published will be allowed to prevent a carrier from collecting the correct rate applicable to an interstate shipment . : . Such an error is not binding upon either carrier or shipper because *both are presumed to know the correct rate. . . . The shiper's knowledge of the lawful rate is conclus-*

*ively presumed,* and the carrier may not be required to surrender the goods carried upon the payment of the rate paid, if that was less than the lawful rate, until the full legal rate has been paid". And in *Huddy v. Railway Express Agency,* 181 S. C., 508, 188 S. E., 247, we said: "Section 2 of the Interstate Commerce Act (49 U. S. C. A., Sec. 2) requires the carrier to collect legal charges. *The shipper, the consignee, and the carrier are all conclusively presumed to know what the legal rate is. . . . Plaintiff is conclusively presumed to have known the provisions of the tariff.* The contract was plainly one for a limited liability within the provisions of the law, and recovery must be limited accordingly."

In *Adams Exp. Co. v. Croninger, supra,* it was held: "That no inquiry was made as to the actual value is not vital to the fairness of the agreement in this case. The receipt which was accepted showed that the charge made was based upon a valuation of $50.00 unless a greater value should be stated therein. *The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of the published schedules filed with the commission.* That presumption is strengthened by the fact that across the top of this bill of lading there was a statement in bold type: 'This company's charge is based upon the value of the property, which must be declared by the shipper' ".

Regardless, therefore, of the ordinary shipper's lack of information concerning the tariffs and schedules of carriers of freight, and his complete inability to understand them—it is more or less a matter of common knowledge that only an expert in that line can do so—there is no escape from the fact that, under the legislation enacted by the Congress, as construed by the Federal Courts, the shipper of goods moving in interstate commerce is charged with constructive knowledge of the applicable tariffs and schedules of rates filed with the Interstate Commerce Commission; and whether there be one rate for the carriage of his particular

kind of goods, or alternative rates therefor based upon the agreed or declared value thereof, he is conclusively presumed to have known the provisions of the applicable tariffs and schedules. *Where an interstate carrier* of goods *has filed schedules establishing alternative rates, dependent upon value, the sender is bound to know the relation established by them between values and rates.*" *American Ry. Exp. Co. v. Daniel,* 269 U. S., 40, 46 S. Ct., 15, 16, 70 L. Ed., 155.

And so it was held by the Supreme Court in *Western Union Tel. Co. v. Esteve Bros. & Co.,* 256 U. S., 566, 41 S. Ct., 584, 65 L. Ed., 1094, instituted more than a year after the passage of the Second Cummins Amendment, where the senders of a telegraphic message failed to avail themselves of a higher rate which imposed greater liability in the event of an error in transmission: "The plaintiffs did not in fact assent to this limitation of liability. They did not, in sending the message, . . . use a blank containing the provisions so limiting liability. They did not have actual knowledge of the resolution of the company or of the filing of the tariffs with the Interstate Commerce Commission. . . . The usual or basic rate was for service practically at the sender's risk, liability being limited to the amount of the toll collected. Another special rate entitled the sender to have the message repeated . . . to the point of origin and rendered the company liable in case of mistake or nondelivery up to fifty times the amount of the extra charge. The question presented for our decision is whether . . . the sender is, without assent in fact, bound as matter of law by the provision limiting liability, because it is a part of the lawfully established rate. . . . The limita--tion of liability was an inherent part of the rate. . . . Before the act the companies had a common-law liability from which they might or might not extricate themselves according to views of policy prevailing in the several states. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate rep-

ıesent the whole duty and the whole liability of the company. It could not be varied by agreement; *still less could it be varied by lack of agreement.* The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because when the rate is used, dissent is without effect. This principle was established in cases involving the limitation upon a carrier's liability for baggage by *Boston & Maine Railroad v. Hooker,* 233 U. S., 97, 34 S. Ct., 526, 58 L. Ed., 868, L. R. A., 1915-B, 450, Ann. Cas., 1915-B, 593, and *Galveston, H. & S. A. Ry. Co. v. Woodbury,* 254 U. S., 357, 41 S. Ct., 114, 65 L. Ed., , decided by this court December 13, 1920".

In the cases here, the bills of lading, upon their face, recite: "Received subject to the classifications and tariffs in effect on the date of the issue of this bill of lading", and, immediately above the agreed or declared value clause, and the signatures of the shippers, we find the following warning: "NOTE—Where rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property".

The pertinent inquiries, therefore, are whether or not the record discloses enough evidence to establish *prima facie* that there were filed with the Interstate Commerce Commission, at the time of the shipments in question, tariffs and schedules establishing more than one rate for household goods and personal effects; if so, whether or not the value of plaintiff's goods was "declared in writing by the shipper or agreed upon in writing as the released value of the property", agreeable to the requirement of the second Cummins amendment to the Carmack amendment; if not, whether there was error in excluding testimony, not as to the *contents* of any tariff or schedule not certified by the secretary of the commission, not as to what such other rates might be, but, as to the *substantive fact* that, as to used furniture, there were alternative rates, dependent upon value; appel-

lant offering to prove such fact by its rate expert, Anderson, either from his own knowledge, or from the printed schedules which every carrier is required to publish and keep in every depot for the use of the public.

Appellant offered in evidence only one schedule or tariff, which showed the rate on household goods shipped from Parkersburg, W. Va., to Columbia, S. C., to be $2.11 per cwt., when the agreed or declared value was stated to be ten cents per pound, but that governing tariff contained the provision: "If the consignor declines to release each article in the shipment to a value not exceeding $5.00 per lb., the shipment will not be accepted", and the further provision: "The released value, which shall be deemed to relate to each article separately and not to the shipment as a whole, must be entered on shipping order and bill of lading". When taken in connection with the quoted testimony of the witness, Duncan, rate clerk of the initial carrier, to the effect that $2.11 per cwt. was the "minimum rate" on household goods, that ten cents per pound was the "minimum valuation" permitted on such goods, and that a higher rate was seldom asked, it seems clear that the record discloses more than one rate applicable to household goods and personal effects, ranging between a minimum of ten cents, and a maximum of five dollars, per pound.

Were plaintiff's agents, the shippers, given a choice of rates, and was the value of his goods "declared in writing" as the released value? The applicable tariffs providing for more than one rate, and shippers being conclusively presumed to know such rates, it was not necessary that such fact should be specifically called to their attention. "In considering whether a shipper had an opportunity to choose between the common-law rate and the limited liability rate, it is held, the question is not what the contract recites in respect to the matter, but whether he had in fact a chance to choose between his common-law rate and a lower rate with limited liability. *It is not essential that the alternative rate should actually be presented to the shipper, however, nor is*

*it material that he did not know of the choice, if such choice existed; it is sufficient if it would have been given him if he demanded it"*. 13 C. J. S., page 182.

In *Robinson v. Louisville, etc., R. Co.*, 160 Ky., 235, 169 S. W., 831, the appellants, who were shippers suing an initial carrier for damages to property shipped by such carrier, contended that the limited liability contract offered as a defense did not apply *because the shippers' attention was not called to it, and they did not voluntarily or knowingly consent to accept the reduced rate, or limit the value of their stock, in the event of loss or damage.* This contention was overruled, the court declaring: "In the case of *Boston, etc., R. Co. v. Hooker*, 233 U. S., 97, 34 S. Ct., 526, 58 L. Ed., 868 . . . the Supreme Court said: "The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and from the published schedules filed with the commission'. In *Kansas City Sou. Ry. Co. v. Carl . . .* the Supreme Court said: 'The valuation the shipper declares determines the legal rate, where there are two rates based upon valuation. *He must take notice of the rate applicable, and actual want of knowledge is no excuse'.* In *Missouri, etc., R. Co. v. Harriman,* 227 U. S., 657, 669, 33 S. Ct., 397, 57 L. Ed., 690, the Supreme Court said: *"When the carrier graduates its rates by value and has filed its tariffs showing two rates applicable* to a particular commodity or class of articles, *based upon a difference in valuation, the shipper must take notice, for the valuation automatically determines which of the rates is the lawful rate.'* "

*Union Pacific Railroad Co. v. Burke,* 225 U. S., 317, 41 S. Ct., 283, 65 L. Ed., 656, relied upon by respondent, is not in point here, or in conflict in any manner with the cases cited, because in that case the decision was rested squarely upon the fact that the carrier's filed and published schedules contained but one rate applicable to the shipment there involved, hence there could be no choice of rates which could be made the basis of estoppel, which is the principle upon

which rests the rule of the Federal courts permitting limitation of liability to an agreed or declared valuation, upon which the rates for carriage are dependent.

"The essential choice of rates must be made to appear before carrier can successfully claim the benefit of such a limitation and relief from full liability. And as no interstate rates are lawful unless duly filed with the commission, it may become necessary for the carrier to prove its schedules in order to make out the requisite choice. But where a bill of lading, signed by both parties, recites that lawful alternate rates based on specified values were offered, such recitals constitute admissions by .the shipper and sufficient *prima facie* evidence of choice. If, in such a case, the shipper wishes to contradict his own admissions, the burden of proof is upon him." *C. N. O. & T. P. Ry. v. Rankin, supra.*

Was "the value declared in writing by the shipper, or agreed upon in writing, as the released value of the property"? It is undisputed that the bills of lading or shipping orders, under which both shipments moved, were *signed in blank by the shippers* after the goods were weighed and listed thereon, but before the agreed or declared value clause was completed, the rate inserted, and the carrying charges computed, but there is no suggestion of fraud, or false billing, or an attempt at rebating, and the only inference to be drawn from the testimony is that the shippers in both cases prepaid the freight charges *after* the "minimum valuation" of "10¢ per pound", fixing the minimum rate, had been inserted in the bills of lading by the rate clerk; indeed, there is not the slightest impeachment of his positive testimony to that effect.

"Neither the statute nor the order of the Commission requires the signature of the shipper. The pertinent words of the statute are: '. . . Rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value . . .' . . . Naturally, such signature would be desirable as constituting the most satisfactory evidence of the shipper's agreement, but it is not made a

prerequisite without which no agreement will result . . . The respondent, by receiving and acting upon the receipt, although signed only by the petitioner, assented to its terms and the same thereby became the written agreement of the parties. . . . In the absence of a statutory requirement, signing by the respondent was not essential. . . . . His signature, to be sure, would have brought into existence additional evidence of the agreement but it was not necessary to give it effect. . . . And his knowledge of its contents will be presumed. . . . 'The receipt which was accepted showed that the charge made was based upon a valuation of $50.00 unless a greater value should be stated therein. The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of the published schedules filed with the Commission.' . . . *Having accepted the benefit of the lower rate, dependent upon the specified valuation, the respondent is estopped from asserting a higher value.* To allow him to do so would be to violate the plainest principles of fair dealing." *American Ry. Exp. Co. v. Lindenburg,* 260 U. S., 584, 43 S. Ct., 206, 67 L. Ed., 414.

"To permit such a declared valuation to be overthrown by evidence *aliunde* the contract, for the purpose of allowing the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward under valuations, and bring about preferences and discriminations forbidden by the law. Such a result would neither be just nor conducive to sound morals or wise policies. The valuation the shipper declares determines the legal rate where there are two rates based upon valuation. He must take notice of the rate applicable, and actual want of knowledge is no excuse. The rate, when made out and filed, is notice, and its effect is not lost, although it is not actually posted in the station. . . . When there are two published rates, based upon difference in value, the legal rate automatically attaches itself to the declared or agreed value." *Kansas City Sou. Ry. Co. v. Carl,* 227 U. S., 639, 33 S. Ct., 391, 57 L. Ed., 683.

While there is no positive testimony to the effect that the bills of lading were delivered to the respective shippers the second time, that is, after shippers had signed them and handed them to the rate clerk for calculation of the freight charges, the statute is mandatory that the "carrier . . . shall issue a receipt or bill of lading" for the property received for transportation, the terms of which are fixed by the Interstate Commerce Commission. *Bryan v. Louisville, etc., R. Co.,* 174 N. C., 177, 93 S. E., 750. Such mandatory requirement is one of the dominating features of the Carmack amendment. *Boston, etc., R. Co. v. Hooker,* 233 U. S., 97, 34 S. Ct., 526, 58 L. Ed., 868. And the presumption is that the law was obeyed, and that the bills of lading in the case at bar were issued and delivered to the respective shippers of plaintiff's goods. *Gamble-Robinson Commission Co. v. Union Pacif. R. Co.,* 262 Ill., 400, 104 N. E., 666. "It cannot be assumed, merely because the contrary has not been established by proof, that an interstate carrier is conducting its affairs in violation of law. Such a carrier must comply with the strict requirements of the Federal statutes, or become subject to heavy penalties, and in respect to transactions in the ordinary course of business, it is entitled to the presumption of right conduct". *C. N. O. & T. P. Ry. Co., supra.* That bills of lading were issued is indicated *prima facie* by copies thereof introduced in evidence. If a shipper's receipt and acceptance of a bill of lading, prepared and handed to him by an interstate carrier, constitutes a declaration in writing, or an agreement in writing, concerning the value of the goods listed and described therein, notwithstanding his signature does not appear thereon, there can be no logical escape from the conclusion that, when the shipper (charged by the tariffs and schedules on file with the Interstate Commerce Commission with knowledge that the rate is dependent upon the value placed by him upon the goods, and with the further knowledge that alternative rates dependent upon value are applicable to the particular goods being shipped) signs the bill of lading in blank before the

valuation and rate are inserted therein, but pays the freight charges after the completion of the bill, all parties thereto, shipper, carrier, and consignee, are bound by the valuation inserted therein, in the absence of fraud, which is nowhere suggested in the record of these causes.

The rights and liabilities of the parties to an interstate shipment of goods, since the passage of the second Cummins amendment to the Carmack amendment, are thus stated in *Petyon v. Railway Express Agency,* 316 U. S., 350, 62 Sup. Ct., 1171, 86 L. Ed., 1525, a decision of the United States Supreme Court filed May 25, 1942: "The pertinent act of Congress is 49 U. S. C., Sec. 20 (11), 49 U. S. C. A., Sec. 20 (11), originally the Carmack amendment of 1906, 34 Stat., 593, since amended several times to its present form. The section requires an interstate common carrier receiving property for shipment to issue a receipt or bill of lading. The carrier is made liable to holder 'for any loss, damage, or injury to such property caused by it' or connecting carriers. . . . Further, the initial carrier is made liable to the shipper for full damages sustained, notwithstanding any limitation of liability in the receipt or bill of lading, *with the exception, important here, that where a carrier by authority or direction of the Interstate Commerce Commission maintains rates dependent upon the value of the property declared in writing by the shipper, such declaration also limits liability of the carrier for loss or damage to an amount not in excess of the declared value.* Following the Carmack Amendment, this court in several cases upheld the power of the receiving carrier to limit its liability to an agreed valuation, made to obtain the lower of two or more rates. . . . *The so-called First Cummins Amendment* of March 4, 1915, 38 Stat., 1196, 49 U. S. C. A., Sec. 20 (11), *prohibited in general any such limitation of liability. By the Second Cummins Amendment* of August 9, 1916, 39 Stat., 441, 49 U. S. C. A., Sec. 20 (11), *Congress adopted the present provisions authorizing limitation of liability in the manner already noted, and substantially restored the rule of Adams Express Co. v. Croninger, supra.*"

On the quantum of recovery permissible, appellant requested 'the following instruction, which was refused:

"The jury is instructed that in calculating the amount of damage which plaintiff has suffered, you can allow him only ten cents per pound for each pound of goods damaged, and not ten cents per pound for the whole of the shipment, as this ten cents per pound is a ratio and not a limitation."

On the contrary, the jury was told by the presiding judge:

"Where a limitation as to the value *has been agreed to,* one is limited in his recovery to that amount specified *if the entire shipment is lost or damaged.* However, it would not be necessary to show the loss or damage to the entire shipment to that amount, but *if any part of the shipment is lost and damaged to the extent of the full liability,* the plaintiff could recover full liability for such as is lost or damaged if the loss or damage would equal that sum, and it is not what the proportionate value of any particular part of the shipment would bear to the total liability."

It is true that his Honor also charged appellant's second request that, "If you find the damage which the plaintiff has alleged was caused by the defendant nevertheless *if you find from the testimony that the plaintiff, or his agents, entered into a contract* of carriage with the defendant, *based upon a released valuation,* upon which valuation the rate charged was fixed, then you must find that the damage to plaintiff has been ten cents per pound only for each pound of goods damaged or lost"; but the last words of the trial judge, in declining to charge appellant's request that "The tariff prescribed by the Interstate Commerce Commission has the force of law, and the shipper is presumed to have constructive notice of it", were these: "I can't charge them that under the theory I have advanced. I wish to say this to you, Gentlemen, that in addition to what I have already told you, you are not bound by the amount claimed in the complaint. *It is for you to determine,* if you find for the plaintiff, *from the evidence in the case, the value of these goods".* While the learned circuit judge was undoubtedly endeavoring to im-

press upon the jury that it did not have to find the full amount claimed by plaintiff in his complaint, in view of his general charge to the effect that, "if any part of the shipment is lost or damaged to the extent of the full liability, the plaintiff could recover full liability . . . and it is not what the proportionate value of any particular part of the shipment would bear to the total liability", the jury must have understood, from his final utterance, that it was for them to determine the value of the goods, that they were not limited to awarding ten cents per pound for the number of pounds actually lost and damaged.

"Where a contract fixes the value of a shipment at so much per pound, . . . or at some other unit of weight or measure, and the rate is calculated on such agreed value, the recovery, *in case of partial loss,* is limited to the agreed value, per unit, of that part of the shipment which was lost, for the consignor is estopped from asserting any unit to have a greater value than the per unit value declared. Where the articles shipped are heterogeneous in nature, it has been declared that the correct rule is to adopt as the agreed valuation of each article that proportion of its actual value which the agreed valuation of the whole shipment bears to the actual value of such shipment." 13 C. J. S., pg. 222. And see *Western Transit Co. v. Leslie & Co.,* 242 U. S. 448, 37 S. Ct., 133, 61 L. Ed., 423; *Kansas City Sou. Ry. Co. v. Carl, supra.*

Under the terms of the bills of lading or shipping orders, the agreed or declared value of the goods was specifically fixed at not exceeding ten cents per pound, and under the applicable tariff admitted in evidence it was provided that "The released value . . . shall be deemed to relate to each article separately and not to the shipment as a whole".

As the cases must be remanded for further proceedings because of appellant's failure below to include the paid freight charges (on the goods actually lost and damaged) in the amounts for which it moved for directed verdicts in favor of plaintiff, we have not thought it necessary to con-

sider the exceptions *seriatim,* but attention is directed to the fact that we have been cited to no authority in support of the contention that it is presumed that a shipper desires to ship his goods unreleased and to pay full freight charges thereon; and to the fact that Sec. 6 of the Interstate Commerce Act requires common carriers subject thereto (1) to file with the commission, and (2) *to print and keep open to public inspection,* in every depot, station or office, *schedules showing all the rates,* fares and charges for transportation between different points, whereas Sec. 16, par. 13, (relied upon for the exclusion of evidence of the substantive fact that, if the released valuation of 10¢ per pound had not been inserted in the bills of lading, the rate charged would have been higher than that actually employed, and that there were alternative rates on household goods, dependent on value) merely provides that "The *copies* of schedules and classifications and tariffs of rates, . . . shall be preserved as public records in the custody of the secretary of the commission, and shall be received as *prima facie* evidence of what they purport to be . . . in all judicial proceedings; and copies of and extracts from any of said schedules . . . certified by the secretary, under the commission's seal, shall be received in evidence with like effect as the originals". Such paragraph merely makes copies certified by the secretary *prima facie evidence,* and this court, in *Aldrich v. Southern Ry. Co., supra,* has clearly implied that rates may be proved in some other manner and by some other evidence—why not by the schedules that interstate carriers are required to publish and keep open to public inspection in every depot, station, or office, in view of the mandatory requirement of the same section that any changes in rates shall likewise be printed and kept open to public inspection.

*Anderson v. A. C. L. Railroad Co.,* 163 S. C., 350, 161 S. E., 523, relied upon by respondent, is not in point here, or in conflict with the conclusions reached, inasmuch as the shipper in that case requested the higher rate, informing the agent of the railroad that he did not wish to ship his goods

at a reduced valuation, and the original bill of lading offered in evidence contained no released valuation.

The judgments below are reversed, and the cases remanded to the Court of Common Pleas for Richland County for further proceedings not inconsistent with the views herein announced.

MESSRS. ASSOCIATE JUSTICES STUKES, TAYLOR and OXNER concur.

On Petition for Rehearing.

PER CURIUM:

Upon consideration of the Petition for Rehearing in the above-entitled causes, we are of the opinion that there has been no misconception of the questions presented by the appeals. The rights and liabilities of the parties, dependent as they are upon the Acts of Congress, the bills of lading, and the decisions of the Federal Supreme Court, have been correctly determined in the opinion herein, which points out the inapplicability here of the decisions in *Anderson v. A. C. L. R. Co.,* 163 S. C., 350, 161 S. E., 523, and *Union Pacific R. Co. v. Burke,* 255 U. S., 317, 41 Sup. Ct., 283, 65 L. Ed., 656.

The Court did not rely upon the single excerpt from the testimony quoted in the Petition, but upon the entire record, and particularly upon the tariff admitted in evidence containing the provision: "If the consignor declines to release each article in the shipment to a value not exceeding $5.00 per pound, the shipment will not be accepted", which, with the testimony of the Rate Clerk of the initial carrier, given by deposition in both cases, was amply sufficient, in the absence of any showing to the contrary, to establish the existence of alternative rates "on second-hand (used) household or personal effects such as clothing, furniture, or furnishings for residences" ranging between a minimum of ten cents, and a maximum of $5.00, per pound.

The decision in the *Burke case, supra,* was rested squarely upon the fact that the defendant-carrier's filed and

published schedules contained *only one rate* applicable to the shipment there involved, hence a choice of rates, necessary to support the reduced valuation, was physically impossible.

In the *Anderson case, supra, it seems that no effort was made by the carrier to show the existence of alternative rates,* and *the written contract between the parties, evidenced by the original bill of lading*—which the plaintiff in that case offered in evidence—*fixed no value whatever of the goods shipped,* although the shipping order and memorandum copy, *allegedly made as carbon copies thereof,* showed a valuation of "$10.00 per cwt.", *and the shipper informed the carrier's agent that he did not.want a released shipment, but would "rather pay the high rate and get the goods there".* Notwithstanding the fact that the *original of the* written contract fixed no value, the carrier attempted to show that, in fact, the goods had moved under a limited valuation and at a reduced rate. Certainly, under the circumstances disclosed by the evidence, *the carrier could not complain* of the trial judge's "Charge" which permitted the jury to determine whether, *in variation of the terms of the written contract between the parties,* the agreement was one of limited liability based upon an alleged released value not contained in the original bill of lading.

In the cases here, unfortunately for plaintiff, his agents, the shippers, one of whom was a practicing attorney, *"signed blank checks",* so to speak, when they signed the bills of lading before they were completed in every detail, *and, in the absence of fraud,* false billing, or an attempt at rebating, *prepayment by the shippers (after the completion of the bills of lading) of the freight (carrying) charges,* calculated upon any lawful rate inserted in the bills before such payment, without objection on the part of the shipper, and not in violation of any instruction given by him, is binding upon all· parties, shipper, consignee, and carrier. It is elementary that, if the contracting party is in position to learn the contents of a written contract and thereby pro-

tect himself by reading it or having it read, one who is unable to read is bound to have the instrument read to him before signing it, just as one who can read is bound to read it before signing. So, also, if one sign a contract before it is completely filled out, he is bound thereby, in the absence of fraud. As said by the late Mr. Justice Watts, afterwards beloved Chief Justice, in *Colt Company v. Kinard,* 126 S. C., 205, 119 S. E., 581, "The courts enforce contracts, but parties make them".

Plaintiff pitched his right to recover the alleged "full actual loss, damage, or injury" upon what is known as the "First Cummins Amendment" (4 March, 1915) to the "Carmack Amendment" of 29 June, 1906, while defendant sought refuge under the "Second Cummins Amendment" (9 August, 1916). Under the Carmack Amendment, limitations of carriers' liability was approved by the Federal Supreme Court in a long line of decisions. The First Cummins Amendment, as pointed out in *Peyton v. Railway Express Agency,* cited in the opinion herein, prohibited in general any such limitation of liability, while the Second Cummins Amendment practically nullified the First and "substantially restored the rule of *Adams Exp. Co. v. Croninger, supra"*, in those cases where limitation of liability is authorized. Particular attention is redirected to *Western Union Tel. Co. v. Esteve Bros. & Co., American Ry. Exp. Co. v. Lindenburg, Id. v. Daniel,* and *Peyton v. Ry. Exp. Agency,* all decided since the passage of the Second Cummins Amendment, and since the decision in *Union Pac. R. Co. v. Burke.*

As to the suggestion—not stressed in respondent's brief or in argument at the bar—that defendant failed to prove that the alternative rates used by it and available to plaintiff, had he requested same, *had actually been filed and approved* by the Interstate Commerce Commission, we have held that the record shows that alternative rates had been filed, and that they had been and were being used by the carirer. Hence, it *might be presumed* that such rates had been *approved* by the Commission, because, under the Fed-

eral decisions, "It cannot be assumed, merely because the contrary has not been established by proof, that an inter-state carrier is conducting its affairs in violation of law. Such a carrier must comply with the strict requirements of the Federal statutes, or become subject to heavy penalties, and in respect to transactions in the ordinary course of business, *it is entitled to the presumption of right conduct*". *C. N. O. & T. P. Ry. Co. v. Rankin*, 241 U. S., 319, 36 Sup. Ct., 555, 60 L. Ed., 1022. *But, as heretofore pointed out, the tariff, itself, admitted in evidence, certified to by the Secretary of the Commission, showed the existence of alternative rates, and it must be assumed that tariffs and schedules certified to by the Commission have been approved by that body.*

Because the cases appear to be hard ones for the plaintiff, and because this court does not look with favor upon contracts limiting the liability of common carriers and public service corporations, we have expressed ourselves at a length not customary in refusing a Petition for Rehearing. We have no doubt, however, that the issues involved have been determined in accordance with the decisions of the Federal Supreme Court.

PETITION REFUSED.