13498

THOMPSON v. BASS *ET AL.*

(166 S. E., 346)

*Messrs. Mauldin & Love* and *J. W. Boyd,* for appellants,

*Messrs. Nicholls, Wyche & Russell,* for respondent, cite:

October 27, 1932.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This action, by the plaintiff, Mrs. Pearl A. Thompson, against the defendants, A. S. Bass and American Fidelity & Casualty Company, Inc., of Richmond, Va., instituted in the Court of Common Pleas for Spartanburg County (the date of commencement not being stated in the record), is a suit for damages alleged to have been sustained by the plaintiff while traveling as a passenger of the defendant A. S. Bass, and caused by the negligent operation of the bus. The defendant American Fidelity & Casualty Company was not made a party in the original complaint, but was later brought in the action in the amended complaint by order of the Court, based on the plaintiff's petition. Issues being joined the case was tried at the June, 1931, term of said Court, before his Honor, Judge T. S. Sease, and a jury, resulting in a verdict for the plaintiff in the sum of $3,000.00. From the order overruling a demurrer in the case and from the judgment entered on the verdict, the defendants have appealed to this Court.

According to statement appearing in appellants' brief, there are five questions raised by the exceptions for the Court to pass upon; and the same will be considered in the order presented by appellants.

Questions 1 and 2, which will be considered together, read as follows:

"1. Is it proper in an action against an assured, based upon a tort, to join the insurer as a party defendant, when it appears to the Court that the policy provides 'that the Company shall not be liable to pay any loss, nor shall any action be brought against the Company to recover under this policy until a final judgment shall have been recovered against the assured in the Court of last resort, after trial of the issue'?

"2. Is it proper to refuse to grant a nonsuit and directed verdict in favor of insurer when it appears by testimony

that the policy. contains the provision above quoted? (Sec. E.)"

The policy in question contains the provision above quoted under question 1, and it is this stipulation in the policy upon which the appellant American Fidelity & Casualty Company relies to sustain its exception. The question was first raised on demurrer before Judge Ramage. The amended complaint contained the following allegations pertinent to this question:

"That the defendant, American Fidelity & Casualty Company, Incorporated, has filed with the Railroad Commission of South Carolina, its policy of insurance covering the operations of the defendant, A. S. Bass, as a motor vehicle carrier in South Carolina, under the terms of the Motor Transportation Act, Act No. 170, Acts of 1925, as amended by Act No. 663, Acts of 1928, insuring and indemnifying the plaintiff and all other passengers against any loss or damage not in excess of the sum of Five Thousand Dollars by reason of such passengers receiving personal injuries as a result of any act of negligence of the defendant, A. S. Bass, and agreeing to pay said passengers any amount not in excess of Five Thousand Dollars that might be recovered against said defendant, A. S. Bass, as a result of personal injuries received while traveling in the motor vehicle of the said A. S. Bass; that the plaintiff in the manner and under the circumstances above described by reason of the acts of negligence of the said A. S. Bass above set forth, received the personal injuries above described to her permanent injury in the sum of Five Thousand Dollars."

To this allegation made by the plaintiff, the appellant Fidelity & Casualty Company interposed the following demurrer:

"1. That said amended complaint does not state facts sufficient to constitute a cause of action against this defendant in that it appears on the face of said complaint that said defendant was in no wise responsible for, connected with,

nor implicated in the accident, or collision, or occurrence out of which plaintiff's alleged cause of action arose.

"2. That said amended complaint does not state facts sufficient to constitute a cause of action against this defendant in that it appears from the face of the complaint that the cause of action alleged therein against this defendant is predicated upon an alleged contract between this defendant and A. S. Bass, whereas the cause of action against A. S. Bass is one for personal injuries alleged to have arisen out of tort. That said causes of action against the defendants herein are inconsistent, separate and distinct, and that they have been improperly united in the amended complaint."

The demurrer was heard before his Honor, Judge C. J. Ramage, who, after due consideration, issued the following order overruling the same:

"This was a demurrer to an amended complaint in the above case;

"After hearing argument and considering the cases of *Piper v. American Fidelity & Casualty Co.* and *Pollock v. Association,* found in 157 S. C., 106, 154 S. E., 106 and 48 S. C., 79, 25 S. E., 977, 59 Am. St. Rep., 695, respectively;

"Ordered and adjudged that the demurrer herein be and the same is hereby overruled and dismissed."

The question was again raised on motion for a nonsuit. In passing upon this motion, his Honor, Judge Sease, before whom the case was tried, made this ruling:

"I think the motion should be overruled. The contract of insurance carries with it the Statute of the State, makes it a part of it; the Statute says that it shall be given for the protection of the traveling public, or that is the proper inference. In other words, the Company wrote it with the Statute before it, and the Statute is part of the contract. Motion overruled. Any further motion?"

We agree with the holding and ruling of the lower Court. As stated by Judge Sease, the statute referred to is a part of

the contract, and must be read into the same. In this connection, in addition to the case of *Piper v. American Fidelity & Casualty Company, supra,* we call attention to the case of *Benn v. Camel City Coach Company et al.,* 162 S. C., 44, 160 S. E., 135. The exceptions raising the above-stated questions are therefore overruled.

Questions 3 and 4, stated by appellants, which will be considered together, read as follows:

"3. Was it proper to refuse the motion for a directed verdict in favor of both defendants when it appeared that the plaintiff, an intelligent, well-informed woman, executed a complete release, understood her acts, and was able to be up and around her home at the time; was able to go down to the bank and cash the check the same day, and executed a separate release on the check?

"4. Was there any, or sufficient evidence of fraud to raise any issue for the jury?"

Pertinent to these questions is the following defense interposed by the defendant A. S. Bass:

"That upon the 10th day of September, 1928, the plaintiff agreed that in consideration of the sum of Fifty ($50-.00) Dollars, and the payment of certain charges for medical and hospital treatment, she would and did fully release and discharge the defendant, A. S. Bass, from any and all claims and demands, losses or injuries which have been, or which may hereafter be sustained in consequence of an accident occurring on the 8th day of September, 1928, and referred to in plaintiff's said complaint as the basis of said alleged cause of action; that in consideration of the plaintiff's said covenant and agreement, the defendant, by way of compromise settlement of plaintiff's alleged claim, agreed to, and did pay to the plaintiff the sum of Fifty ($50.00) Dollars, and did pay the further sum of Twenty ($20.00) Dollars to the Mary Black Hospital, of Spartanburg, South Carolina, for the medical and hospital treatment, thus fully performing said agreement on the part of this defendant.

"3. That this defendant pleads the foregoing executed agreement and release, both in bar of plaintiff's cause of action herein, and by way of equitable estoppel against the assertion on the part of the plaintiff of the claim set forth in the complaint."

To this defense the plaintiff filed a reply, and, in support thereof, introduced testimony tending to show, in effect, that she was injured in the City of Laurens, while riding as a passenger for hire on a bus of the defendant A. S. Bass Saturday, September 8, 1928, in the manner and under the conditions alleged in the complaint; that thereafter, on the following Monday, September 10, 1928, when her physical and mental condition, caused by her said injuries, was such that she was unable to transact any business, or read and understand any documents, Mr. Bass, one of the defendants herein, and another gentleman, who, it now appears, was acting in the capacity of agent for the defendant Bass, for the purpose of procuring a settlement in the matter, early in the morning of said day went to the plaintiff's home in the City of Spartanburg; that Mr. Bass and Mr. Davenport, the gentleman who accompanied Mr. Bass, stated to the plaintiff that they just wanted to see if plaintiff was all right, stating that they knew that she was in the said accident, and also knew she had been to the clinic (Mary Black Clinic, in Spartanburg) where she had her ankle treated. According to plaintiff's testimony, these gentlemen also talked with her about the expenses. When asked at the trial what her condition was at the time these gentlemen called to see her, on the date above stated, she answered, "I was very nervous," and that she was suffering from pain, stating that the pain was internal, and, further, testified that when they first went in to see her she told them that she was too nervous to talk to anybody. She further testified that at the time her husband was in bed sick. The plaintiff further testified, in this connection, as follows:

"Q. After you told them then you were too nervous and not in condition to talk to them, what did they say? A.

When Mr. Bass came to see me Monday morning he told me that when passengers were hurt while traveling on one of his buses, it was customary for him to give them something to help pay their expenses, and he wanted to give me $50.00 to help pay my expenses, and for me to sign a receipt for the $50.00.

"Q. Sign a receipt? A. A receipt.

"Q. Did they read the receipt to you? A. No.

"Q. Did you read the receipt? A. No, I wasn't in any condition to read it.

"Q. And you received from them the fifty dollars? A. Yes.

"Q. Did anyone at that time tell you what you were signing was a release? A. No.

"Q. When was the first time you heard that anyone was claiming you signed a release on that occasion, Mrs. Thompson? A. Mr. Byrnes (one of plaintiff's attorneys) told me.

"Q. That was after this suit had been brought? A. After the suit had been brought."

In the course of her testimony the plaintiff also stated, in effect, that she not only received an injury in her foot or ankle, but that she received an injury in the lower part of her stomach, and it soon began to pain her; that she did not get those in charge at the Mary Black Clinic to examine her stomach and injury referred to for the reason that it occurred to her that it would be best to have her regular family physician, Dr. Wallace, of Spartanburg, see her and make the examination in that respect, and stated that she had Dr. Wallace see her several times. Dr. Wallace, according to plaintiff's testimony, died before the trial of the case. In a short time following the accident, the plaintiff went to Columbia, where she had a brother-in-law, Dr. Ben F. Wyman, examine her and Dr. Wyman called in Dr. Baggott, of Columbia, to examine her and assist in treating her. The plaintiff, it seems, did not respond to their treatment, and later she had to undergo a very serious operation, all of

which, as she contends, was caused from the injuries she received in the collision referred to.

In connection with the issues under consideration, and as having a bearing on the same, we also call attention to the testimony of Dr. B. F. Wyman, of Columbia, a brother-in-law of Mrs. Thompson, the plaintiff; according to Dr. Wyman's testimony the plaintiff had been a constant visitor in his home, and, having had an opportunity to observe her, he knew she was in excellent health prior to the time she was injured in the accident referred to, which caused the injuries she alleged. Dr. Wyman further testified that, when Mrs. Thompson came to his home about a week after the accident, she was suffering from an injury in the lower abdomen. In this connection, Dr. Wyman testified as follows:

"Q. Then did you see her about a week after September 8, 1928? A. Yes, sir.

"Q. Where did you see her at that time, sir? A. In Columbia.

"Q. She had returned to your home? A. She returned.

"Q. Did you have occasion to examine her for any injuries she might have sustained at that time? A. Yes.

"Q. What injuries, if any, did you find, and just describe to the jury the condition of them and where. A. Well, by reason of what she said I did examine her, and at that time there was evidence of some injury in the lower abdomen, some slight swelling; wasn't any particular breaking of the skin, anything like that, not exactly black and blue, but enough to call your attention to where there was a lick, and she was very tender under pressure, and as I say, it was slightly swollen.

"Q. Now, then, as a result of Mrs. Thompson's complaint, did you find any trouble with her at that time, sir? A. Yes, Mrs. Thompson, if I might say, did not get away, she had been with us off and on all summer on a trip down to the lower coast; she went to the coast and she came by

and stopped with us a while in September, and she left and then she came back on account of not being well; and when she came and I inquired into it, and found she had been injured, and she was having considerable female trouble, and not particularly desiring to treat a member of our family—because I considered her that, she was my wife's sister—and still being desirous of doing something for her, and I prescribed some treatment, and not improving from that I asked Dr. B. H. Baggott to come around to see her, and he came around.

"Q. Now, the condition you found her in, the ailment she was suffering from, state whether or not, in your opinion as a practising physician, such an ailment could have been caused by the blow across the abdomen, which you heard her testify to this morning? A. Absolutely, sir.

"Q. State, whether or not, in your opinion, her ailment was caused by that injury? A. Yes, sir.

"Q. Now then, I believe you treated her a period of several weeks, you and Dr. Baggott together? A. Yes, sir.

"Q. Trying to avoid an operation? A. Yes, sir.

"Q. Now, did she respond to treatment? A. No, sir, Dr. Baggott and I, after this examination and consultation to determine, we did do what we call the Epion treatment, waiting and watching to see if she could do without the operation; and Mrs. Thompson got to staying in bed over a considerable period, but the minute she got up she would get worse immediately; she wanted to come home for Christmas holidays; she stayed with us from practically the middle of September to November, practically two months, and she decided to come and did come home, and on information I received I came to Spartanburg in my automobile and carried her back to Columbia, right after the first of January.

"Q. What was her condition at that time? A. She had not improved, she seemed to be worse.

"Q. In consequence of the condition you found at that time, what did you and Dr. Baggott determine to do? A. We determined to operate.

"Q. Did you operate on her? A. We did.

"Q. Was it a very serious operation? A. A very serious operation.

"Q. What did you have to do, describe the operation? A. It is what we call the extellus, the removing of the womb on account of excessive bleeding, and on account of the enlarged, I might say, inflammation that at the time it had become markedly worse since September we felt it was the only thing to do; of course, an operation like that is very serious, we don't want to do it on young women anyway, but we had to do it.

"Q. Is the woman the same after the operation? A. No, it is impossible.

"Q. Does it impair her health? A. It impairs her health, bound to do it, it necessitates sewing up and tying up of the organs.

"Q. How long did she stay in the hospital, Doctor? A. Oh, I imagine two weeks.

"Q. Then where was Mrs. Thompson taken? A. She came back to my house.

"Q. How long was it before she was able to be out? A. She stayed in bed, and we brought her home, I think she came in an ambulance, it doesn't matter, you can bring them home in an automobile as well, she stayed with me until the first of March, or after the first of March; she was in the house I imagine in the neighborhood of six weeks after the operation.

"Q. Now, Doctor, you heard Mrs. Thompson testify this morning, did you not? A. Yes, sir.

"Q. You examined her a week afterwards; what would you say about her condition two days after she sustained the injuries she testified to? A. She had to be in a nervous, hysterical type of condition.

"Q. Would you think she would be in condition to carry on business affairs, or protect her rights in any transaction? A. I don't think so."

It is true the testimony of Dr. Wyman as to Mrs. Thompson being "in a nervous hysterical type of condition" and not being "in a condition to carry on business affairs or protect her rights in any transaction" at the time Mr. Bass and Mr. Davenport called upon her and procured from her her signature to the paper in question was largely an expression of his opinion, but based, however, upon the condition he found Mrs. Thompson in shortly after the accident, and on his knowledge of medicine and as a practising physician; and, in our opinion, this testimony was properly not objected to by opposing counsel and allowed to be introduced in evidence for the jury's consideration, in connection with the testimony of Mrs. Thompson, in determining the issue as to whether or not Mrs. Thompson was in a physical and mental condition to transact a business matter, read and understand the paper presented to her to be signed and protect her rights, or whether she was misled and imposed upon by Mr. Bass and Mr. Davenport and her signature procured to the paper in question by practising a fraud upon her. According to the testimony introduced on behalf of the defendants, the signature of Mrs. Thompson to the paper in question was procured properly, and that she should be bound by the provisions thereof. However, under our view of the record, more than one reasonable inference can be drawn from the testimony, considered as a whole, as to the issue under consideration, and, bearing in mind the rule that, in deciding whether such issues should be submitted to the jury, the testimony must be considered most favorably for the plaintiff, we think no error was committed by the trial Judge in overruling the defendants' motions and in submitting the case to the jury to determine the issues under consideration, the validity of the release plead by the defendants. In this connection we call attention to some of

the general rules of law declared by our Court, which we deem applicable.

"If one of the parties induces the other to sign a paper in reliance upon his representation as to its contents, and the representation turns out to be untrue and fraudulently made, the party who relied on it is not bound to him who deceived him into signing the paper." *Parham v. Atlantic Life Insurance Company*, 111 S. C., 37, 96 S. E., 697; *Continental Jewelry Company v. Kerhulas*, 136 S. C., 502, 134 S. E., 505, 507, and authorities therein cited.

"Fraud is a false representation of a fact, made with knowledge of its falsity, or recklessly, without belief in its truth, with the intention that it shall be acted upon by the complaining party, and actually inducing him to act upon it to his injury. * * * " *Southern Iron & Equip. Co. v. Bamberg, etc., R. Co.*, 151 S. C., 506, 149 S. E., 271, 277.

Of course, in the case at bar, as in other cases, fraud is provable by circumstantial evidence, and, if more than one reasonable inference can be drawn from the testimony as to whether fraud was practised, the issue must go to the jury. We further call attention to the fact that, in passing upon the issue under consideration, it must be kept in mind that, if the testimony of the plaintiff is to be believed, and that is solely a jury question, the plaintiff, on account of her condition, produced by acts of the defendant Bass, and his agents, was incapable of attending to any business transaction, unable to read and understand any document, and unable to protect her rights, at the time Mr. Bass and Mr. Davenport presented to her the paper in question for her signature, and further that, after knowing of her condition, they procured her signature on the representation that the said paper was a receipt for the sum of $50.00 they desired her to have at that time for the purpose of expenses. Great stress is laid upon the fact that the plaintiff is an educated lady. It is true, as a general proposition, educated

people are better able to protect their rights in a business matter than those who are uneducated, and this fact should be taken into consideration in passing upon issues growing out of transactions they may have with other persons, but, when the nerves are shattered and the body suffering with pain, such as the plaintiff testified her condition to be at the time in question, the educated are no longer able to protect their rights and must of necessity rely upon the confidence they have in those with whom they deal. Of course, this Court is not permitted to pass upon the credibility of the witnesses in the case, such issues being wholly for the jury, and we are clearly of the opinion that more than one reasonable inference can be drawn from the testimony on all of the issues involved. Therefore the exceptions raising questions 3 and 4, as stated above, must be overruled.

The fifth question reads as follows: "5. Is it proper over the objection of counsel to order new matter inserted into the transcript of record in lieu of official transcript of testimony without any showing that the official stenographic record is incorrect?"

The Circuit Judge, in the settlement of a case for appeal to this Court, has power, under the law, to correct any error appearing in the case, and it has not been made to appear to this Court that his Honor, in the correction made, which the appellant complains of, committed any error. The exception is overruled.

In the statement of the issues for this Court to pass upon, as set forth in appellant's brief, no question is raised as to the proof or failure of proof of the allegations charging the defendants with causing the alleged injuries to the plaintiff, but we may say, in passing, in our study of the record of the case we are convinced that there was ample evidence to carry the case to the jury on such question. In this connection, we also call attention to the fact that no allegation of error is imputed to the trial Judge regarding his charge to the jury.

The exceptions are overruled, and it is the judgment of this Court that the judgment of the Circuit Court be, and the same is hereby, affirmed.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER and BONHAM and MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN concur.