**AMERICAN MUT. LIABILITY INS. CO. v. PLYWOODS-PLASTICS CORPORATION.**

Civ. A. No. 1719.

United States District Court

E. D. South Carolina, Aiken Division.

Dec. 3, 1948.

David W. Robinson and James F. Dreher, both of Columbia, S. C., and George M. Kevlin, of Philadelphia, Pa., for plaintiff.

George Warren, of Hampton, S. C., and Charles B. Elliott, of Columbia, S. C., for defendant.

TIMMERMAN, District Judge.

This action is to recover insurance premiums. Two causes of action are alleged in the complaint, the first for a premium alleged to be due the plaintiff by the defendant on Workmen's Compensation Policy No. WC-272669-E, covering the period from October 30, 1944 to October 30, 1945, and the second for a premium alleged to be due plaintiff on Public Liability Policy No. MC-27189-E, effective from October 30, 1945 to October 30, 1946.

The basic question involved here has been from the first whether the premium on Policy WC-272669-E is to be computed in accordance with the terms of the policy; the plaintiff maintaining that it must, but the defendant claiming that a different method of premium computation was fraudulently represented to it as the applicable one by the plaintiff's agents when the policy was contracted for, or that the premium computation was later changed under an accord and satisfaction entered into between the parties in October 1946. There have also been several collateral issues involving the correctness of certain reserves set up by the plaintiff and the inclusion by the plaintiff in computing the premium of certain logging payrolls. However, a stipulation entered into by the parties on November 22, 1948, has fixed the amount of premium due if the premium is to be computed under the policy's terms and the effect of this stipulation is to eliminate from my consideration all issues save the primary one—whether the premium is to be computed in accordance with the strict terms of the policy.

The defendant's first claim is that the premium provided for in the policy does not control because it was induced to accept the policy because of fraudulent misrepresentations made by plaintiff's authorized agents. The defendant says that, by reason of prior cordial business relations between the parties, originating in 1941, plaintiff had induced it "to repose special trust and confidence in the plaintiff and its representatives relating to matters of Workmen's Compensation and Employer's Liability Insurance"; that, taking advantage of defendant's trust, plaintiff's agents falsely and fraudulently represented the terms of said policy to be other than those contained in it when delivered, and that defendant had caused it to accept such representations as true and to rely thereon.

The representations which defendant claims plaintiff's agents made are: "That the plaintiff would carry the said insurance coverage for the defendant for which the defendant would pay to the plaintiff all of the losses by reason of all claims under the workmen's compensation and employers' liability laws, from October 30, 1944, during the year following, plus thirteen per cent (13%) thereof for the servicing of said claims, and that the defendant would pay to the plaintiff from time to time funds for the payment of losses and for a reserve for the payment of losses to be incurred under such agreement, and that no dividend or other charges would be paid by the plaintiff to the defendant." Par. 6, Deft's. Answer.

The policy, after execution, was delivered to defendant on December 6, 1944 and contained a premium payment plan quite different from the one defendant claims was represented to it. The premium payment

plan which defendant claims was represented to it, prior to the delivery of the policy, would have been in contravention of South Carolina law, Secs. 7035-76(a) and 7994, S.C.Code, 1942, since it had not been approved by the State's Insurance Commissioner. The plan actually incorporated in the policy had been so approved and it was on file in the Insurance Commissioner's office at the time the policy was issued.

The defendant, a Massachusetts corporation, started its business operations in South Carolina in 1941 and at about that time plaintiff became its Workmen's Compensation and Employer's Liability Insurance carrier and so remained until October 30, 1945. All policies issued and accepted prior to the effective date of WC-272669-E (the policy with which we are presently concerned) were issued upon the Standard Premium Plan. The last yearly policy preceding the one here in question expired October 1, 1944. Prior to its expiration and at the request of the defendant (Ex. P-K) plaintiff, on September 27, 1944, executed and delivered a binder extending defendant's insurance coverage until the issuance of new policies (Ex. P-I). About that time the parties exchanged letters concerning re-rating defendant's saw mill operation. Defendant contended that such operation should be considered and rated as an "integral part" of its main plant, which took a lower rate than the saw mill operation. Plaintiff did not agree, holding that the saw mill was a more hazardous operation requiring a higher premium rate. In this matter they dealt at arm's length.

In the meantime, the defendant had been informed that, based on its prior accident record, its standard premium rate, if continued, would be about fifty-four per cent (54%) higher than the rate for the previous year. Defendant was greatly dissatisfied with this increase and threatened to become a self-insurer. A conference was held between representatives of the parties in defendant's offices at Hampton, S. C., on October 31, 1944. Representatives of plaintiff, Messrs. W. I. Blanton and J. E. Ragsdale, submitted for defendant's consideration Retrospective Premium Rating Plan C under which defendant would become, in part, a self-insurer. There is disagreement as to what the plan was represented to be. It is not disputed, however, that the plan was on file with the Insurance Commissioner and had been approved by him. Plaintiff's representatives testified that they explained the plan in accordance with its terms, although they did not have a copy of it with them at the conference. On the other hand, the President of the defendant testified as follows:

"They (plaintiff's agents) presented the program verbally without any documents or any ability to back up in writing a contemplated policy, and told us in effect that that is what they would sell us in the way of coverage, and that under that type of coverage, we would be paying exactly the losses plus an administration charge. To us, that seemed to be a very fair program. After all, the insurance companies are not in business to pay everybody's losses without some remuneration for it. And so, we felt that was the type of coverage we wanted, and either Mr. Blanton or Mr. Ragsdale then dictated this letter that I have in my hand (Ex. P-1). And, that was as far as I knew about the type of coverage we would receive.

"Q. What amount was the premium?

"A. That was the day after the expiration of the old policy when something had to be done in a hurry. The amount of the actual premiums would be the actual losses plus administration costs, such as medical, hospitalization, and so forth, plus thirteen percent of the overall figure.

"Q. State please whether or not the words used in that letter were 'Retrospective Plan C'?

"A. Yes, sir.

"Q. Did they explain to you—that is Mr. Blanton or Mr. Ragsdale—what that was?

"A. They explained the plan. They didn't define it. I doubt whether they could. I haven't yet been able to define the plan. But, under that plan, the sum-substance of the premium payments was to cover the total losses plus whatever hospitalization, medical and so forth, plus thirteen per cent of the overall figure. As I said before, that seemed very reasonable to us." Tr. Rec. pp. 27, 28.

At the conclusion of the conference the following letter was written by defendant to plaintiff:

"Please cancel our workmen's compensation insurance coverage effective October 30, and as of that date rewrite our coverage under the Retrospective Rating Plan C, which is the plan having no minimum premium other than the basic premium."

This letter is in evidence as Ex. P-F, and is the one referred to in the cited testimony of defendant's president.

Shortly thereafter the policy was executed and it was delivered to defendant on December 6, 1944. The policy is in evidence as Exs. P-A and D-25. It was effective for one year, commencing October 30, 1944. After the policy had been in its possession for approximately a month, defendant's treasurer, on January 4, 1945, wrote plaintiff in part as follows:

"We received the new policy from you but frankly we do not understand it at all. At your first opportunity we wish you would pay us a visit and explain the operation of the new deal." Ex. D-1.

To this letter plaintiff replied on January 8, 1945, as follows:

"In accordance with your letter of January 4, one of our representatives will call upon you very shortly for the purpose of making a proper explanation concerning your account. Perhaps by the time of our call, you will have received audit invoice covering the audited premium covering the month of October, the payroll figures for which were forwarded by you to our Atlanta Office on December 29". Ex. P-J.

Mr. Bauer, secretary and treasurer of the defendant, and author of the letter of January 4, 1945, testified somewhat hazily concerning a conference between himself and a representative of the plaintiff on January 25, 1945. I am convinced that such a conference was held on the date stated and that the policy, which defendant had held for about eight weeks, was then discussed. Plaintiff's representative testified quite explicitly that he did visit defendant's offices in Hampton on January 25 and that he fully discussed the provisions of the policy with Mr. Bauer. There were premium installments then past due on the policy. A schedule of payments thereon, to be made during the month of February following, was agreed to. Mr. Bauer professed slight, if any, recollection of what transpired at the conference, but it is hardly a coincidence that the schedule of payments testified to by plaintiff's representative as having been agreed to was followed in almost complete detail. Plaintiff's representative further testified that, as Mr. Bauer agreed would be done, the defendant made the following payments on past due premium installments: February 1, 1945, $6,069.84; February 13, 1945, $1,586.56; and February 27, 1945, two payments of $1,586.56 each; or a total of $10,829.52 during February. Moreover, defendant continued to make monthly premium payments of $1,586.56 each for some time, the last one in August 1945.

The defendant at no time between December 6, 1944 and August 21, 1945, repudiated the policy or offered to return it, but accepted benefits thereunder. The defendant was billed during the period mentioned and afterwards for premium payments based upon the terms of the policy until September 14, 1946, on which date counsel for defendant wrote plaintiff in effect that the defendant thought there was some misunderstanding of the premium plan under which the plaintiff had been billing the defendant. Ex. D-21. After the issuance and delivery of the policy, plaintiff wrote defendant numerous letters concerning its premium account and requesting payment of past due premium installments. The defendant also wrote plaintiff a number of letters, in none of which did it claim that the policy had been misrepresented to it. The defendant had possession of the policy for a year, nine months and eight days before its attorney wrote suggesting that there had been a misunderstanding of the premium plan.

The defendant had a low accident record during the first eight or nine months of the policy period and consequently a relatively low premium rate under the Retrospective Rating Plan C incorporated in the policy, but defendant's accident record increased during the latter months of the policy period to such an extent that its premium rate under Plan C was greatly accelerated.

The weight of the evidence is against defendant's charge of fraud or fraudulent misrepresentation. The facts do not substantiate defendant's contention that a relationship of confidence and trust existed between the parties. The clear purport of the testimony is to the effect that they dealt at arm's length. Prior to the execution of the policy they were in disagreement as to the proper rate on defendant's saw mill operation, and defendant expressed vigorous dissent to the increase of his standard premium rate, which was occasioned by its prior accident record. Moreover, defendant had independent insurance brokers to advise it in respect to its insurance. While defendant now disclaims any right to dividends under the policy, a right which is given under it, it nevertheless continued in effect an assignment of fifty per cent of all dividends accruing to it "on any and all policies written by the American Mutual Liability Insurance Company" for it, as compensation for the services of its insurance brokers. It is not reasonable to suppose that defendant would have kept the assignment in effect if it had renounced its right to the thing assigned.

Under the policy defendant became, in part, a self-insurer. The ultimate premium could not be determined until after the period of coverage had expired and all claims arising under the policy had been determined. The policy had no minimum premium except the basic premium; and the maximum premium depended on the number and seriousness of the accidents falling within its coverage. In other words, if the defendant had had a low accident record the premium would have been relatively low. On the other hand when it had a high accident record the premium became relatively high. The plaintiff, of course, was in no way responsible for the defendant's accident record.

■ The defendant complains that the provisions of the policy are so "highly intricate and technical" that an average layman cannot interpret them without expert aid. That may be true, but the fact remains that the rate provisions of the policy were on file with and had been approved by the Insurance Commissioner of the State. They would have been ineffective without such approval. Even with the Commissioner's approval, defendant was under no compulsion to accept Retrospective Premium Plan C. It could take it or leave it, or adopt some other plan, or become a self-insurer. It now appears that the defendant's premium rate is slightly higher than it would have been under the standard premium plan; but that is hind sight. The defendant would have had a lower premium rate if its accident experience had been favorable during the period of coverage. However, the results are not the business of the Court. The Court cannot make or unmake contracts for parties. The facts show that defendant accepted the policy and received the benefits of it.

If it should be assumed that the agents of the plaintiff actually misrepresented the terms of the policy on October 31, 1944, before it had been executed and delivered to the defendant, although plaintiff's testimony thereabout is not very clear or convincing, the further facts remain that the defendant received the policy on December 6, 1944; that at defendant's prior request an agent of plaintiff went to the defendant's place of business on January 25, 1945, and discussed the policy with its secretary and treasurer, who then and there agreed to a schedule of payments on past due premium installments; that, during the next month, defendant made payments in accordance with the agreed schedule and thereafter continued to pay monthly premium installments until in August 1945; and that the defendant, at no time during that period or afterwards before the latter part of 1946, approximately a year after the expiration of the coverage of the policy, made any contention that the terms of the policy had been misrepresented, or that there was any misunderstanding of its terms.

The defendant has failed to establish, by the greater weight of the evidence, its charge of fraud.

■ This case, of course, is controlled by South Carolina law, and I am indebted to able counsel for very full and comprehensive legal briefs, in which leading South Carolina cases are briefed. I shall not discuss all of the cases cited. That would unduly extend this opinion. But I shall no-

tice most of them, especially those cited by defendant's counsel.

Broadly stated, defendant's legal position, apart from its defense of accord and satisfaction, is based on "fraud and deceit and damages flowing therefrom"; and it "is not seeking a reformation of the contract nor relying on an oral contract but is defending on the ground of tort." Defendant's brief.

J. B. Colt Co. v. Britt, 129 S.C. 226, 123 S.E. 845, holds that one inexcusably inattentive to the protection of his own interests in the making of a contract will be estopped to claim fraud in repudiation of the contract; and further that one entering into a written contract should read it and avail himself of every reasonable opportunity to understand its content and meaning. The defendant contends that the facts of the instant case are distinguishable from the Britt case. Perhaps that is true to an extent, but such circumstance does not alter or change applicable legal principles. Britt signed a purchase order for goods which by its terms became an irrevocable contract on its acceptance by the company. It was accepted and the goods ordered were shipped. Britt then contended that the seller's agent had misrepresented the terms of the contract and that he had signed it in reliance thereon without reading it. In the instant case, defendant claims that he ordered the policy in question before seeing it and in reliance on representations made by agents of the plaintiff as to its terms; but that isn't all. The defendant received the policy a few days after ordering it, kept it for a month and, apparently after reading it, wrote plaintiff it didn't understand its terms—not that its terms had been misrepresented. In the meantime defendant withheld payment of premium installments. A requested explanation was made within the month and thereafter the policy was retained, past due premium installments were paid, and other monthly installments were met for six consecutive months. These additional facts make the Britt case applicable.

Continental Jewelry Co. v. Kerhulas, 136 S.C. 496, 134 S.E. 505, 507, heavily relied upon by defendant, does not warrant the inference, as contended, that the Britt Case was modified or overruled by it. Mr. Justice Blease, author of the opinion, carefully refrained from directing "attention specifically to the evidence" in the Kerhulas case, because it was to be re-tried, However, it does appear from his opinion that there was evidence which, if believed, tended to prove that Kerhulas was a Greek who knew little of the English language, so little he couldn't keep his own books or attend to his correspondence, and that an agent of the plaintiff induced him to sign an order for goods on the representation that he was signing a consignment agreement on which he would receive a commission and "would not have to put out one penny". The Supreme Court reversed the trial court's direction of a verdict for the plaintiff on the ground that the issue of fraud should have been submitted to the jury with appropriate instructions. The facts in the Kerhulas case stand out in striking contrast to the facts in the instant case, where the defendant's representatives were men of intelligence and wide business experience, one the president and the other the secretary-treasurer of the defendant, a large business corporation, which was able to and did employ insurance brokers to advise it, not to mention again other important circumstances pointed out above.

Another case relied on by defendant is Ellis v. Johnson, 143 S.C. 325, 141 S.E. 564. In that case a brother-in-law overreached, misled and deceived his wife's sister who had lived in his home as a member of his family, and who trusted and respected him. The facts of that case develop a sorry story of misplaced trust and ensuing deception. I see nothing in it to support defendant's contention in the instant case.

In Thompson v. Bass, 167 S.C. 345, 166 S.E. 346, cited by defendant, it was held that a release could be attacked for fraud and that such issue should be submitted to a jury, if the evidence tended to support the charge of fraud. In that case the plaintiff, a lady, had been seriously injured by the actionable negligence of the defendant. Less than 48 hours after the accident, while the plaintiff was in no fit physical or mental condition to transact business and while her husband was sick in bed, the defendant accompanied by one of his agents visited

the home of plaintiff and induced her to sign a release on the representation that he desired to make a contribution of $50.00 to her expenses, as was his custom when passengers were injured on his bus. Also there was medical testimony to the effect that the plaintiff was in no condition to deal at arm's length with the defendant at the time the alleged release was secured; and plaintiff testified that the paper she signed was represented to her to be receipt for a contribution—not a release from liability. The Supreme Court affirmed judgment for the plaintiff. The facts in the instant case do not in the remotest degree parallel those in the Thompson case. In the instant case the defendant kept the policy for almost two months before making a premium payment. Its officers, all experienced business men, considered the policy's provisions, as is evidenced by its letter of January 4, 1945, and by its conduct in making past due premium payments and others after it had gone over the policy with an agent of the plaintiff on January 25, 1945. The policy itself shows that it could not have been construed to mean what defendant now claims the policy was represented to mean, whatever may be said of its intricacies. Moreover, the policy form had been approved by the State's Insurance Commissioner and it was on file in his office and open to public inspection. See Hart v. Harrison, 155 S.C. 147, 152 S.E. 17; Souba v. Life Ins. Co. of Virginia, 187 S.C. 311, 197 S.E. 826; Himes v. Metropolitan Life Ins. Co., 207 S.C. 420, 36 S.E.2d 137; and Provident L. & Acc. Ins. Co. v. Anderson, 4 Cir., 166 F.2d 492.

The defendant lays stress upon the following from the Thompson Case [167 S.C. 345, 166 S.E. 350]: "If one of the parties induces the other to sign a paper in reliance upon his representation as to its contents, and the representation turns out to be untrue and fraudulently made, the party who relied on it is not bound to him who deceived him into signing the paper." This statement should not be considered out of its context. It should be considered in the light of the aforementioned facts which called for its expression. I am sure the Court did not mean to say that one would not be bound by a paper which he executed,

if he knew, or if, in the exercise of ordinary, simple prudence, he would have known the asserted representations as to its terms were false. In the instant case the defendant didn't sign a paper at all; it simply accepted and retained one signed by the plaintiff. The paper (the policy) was in legible printing and typewriting. It could be read in a few minutes or, at least, that part of it about which this controversy rages. The defendant's officers evidently read and perhaps re-read it, as appears from the letter they wrote about it after having it in possession for four weeks. Additionally defendant never returned the policy during the period of its coverage, or, during such period, refused to accept the insurance which it provided.

The facts in Halsey v. Minnesota-South Carolina Land & Timber Co., 174 S.C. 97, 177 S.E. 29, 100 A.L.R. 1, and in this case are quite dissimilar. In the Halsey case it was held that, where the facts are in dispute, fraud is an issue for the jury, that fraud may be inferred from circumstances, that wide latitude is permitted in proof of fraud, that, to constitute actionable fraud, a materially false representation must be made, with knowledge of its falsity and intending it to be acted upon, and that the one to whom the misrepresentation is made must act upon it in the honest belief of its truthfulness. It does not hold that an intelligent business man can hold a written contract to which he is a party for the full period of its coverage, and for almost a year thereafter accept benefits under it and then repudiate it for fraud.

In Thomas v. American Workmen, 197 S.C. 178, 14 S.E.2d 886, 887, 136 A.L.R. 1, it is said:

"The policy of the courts is, on the one hand, to suppress fraud, and on the other, not to encourage negligence and inattention to one's own interest. Either course has obvious dangers. But the unmistakable drift is toward the just doctrine that a wrongdoer cannot shield himself from liability by asking the law to condemn the credulity of the ignorant and unwary."

With that doctrine I thoroughly agree. I even stop to applaud it. But, in the instant case, we are not dealing with the ig-

norant or unwary; we are dealing with learned, experienced and alert business men.

The following quotations from cited cases seem more in point here than those previously considered:

"The appellant is possessed of intelligence, can read and write * * * kept the policy in her possession for a period of about six months * * * continued * * * to pay monthly premium thereon * * * and having kept the policy and continued to pay the monthly premium thereof, under the circumstances * * * in our opinion, the plaintiff should not be heard to complain that the insurance company practiced the alleged fraud upon her in not delivering to her the kind of policy she claims to have agreed to purchase." Frierson v. Inter-Ocean Casualty Co., 168 S.C. 178, 167 S.E. 232.

This case was decided shortly after the Thompson Case above cited.

"Did the conduct of the plaintiff, in the circumstances recounted, amount to a conscious or reckless disregard of her duty to avail herself of the opportunity and means at hand to protect her own interests? While she was a woman of limited education, it appears that the plaintiff was a person of some intelligence and knew what she wanted. It is true that she did not have the policy in her possesion at any time before the death of the insured, but she could have easily obtained it from her brother, who lived with her in the same house, and who had the policy in his possession. She had the fullest opportunity for more than a year to do so, but according to her own statement, she never even spoke to him about the insurance, thereby indicating the greatest indifference to her duty in the matter. In these circumstances, we are constrained to hold that her conduct, in failing to employ the opportunity and means given her to acquaint herself with the contents of the policy, was clearly a conscious and reckless disregard of her duty in the premises and was a proximate cause of her alleged injury or damage." Hood v. Life & Casualty Ins. Co. of Tennessee, 173 S.C. 139, 175 S.E. 76, 79.

"In the case of Hyder v. Metropolitan Life Ins. Co., 183 S.C. 98, 190 S.E. 239, 243, this established rule of law is reiterated: 'When the parties have reduced their contract to writing, the court can look only to the terms in which the parties have expressed their intention in such writing.'— citing Blackwell v. Faucett, 117 S.C. 60, 108 S.E. 295.

"True, this is not an action to enforce a contract of insurance, but is one in tort. Nevertheless, the quotation serves as an additional warning to those who would avoid a written contract on the ground that it does not express the terms of an oral agreement and the variation has but just been discovered that, if the failure to discover the difference is due to the negligence of the plaintiff in acquainting himself with the contents of a written instrument, he will not be heard by the courts of law or of equity." Dukes v. Life Insurance Company of Virginia, 184 S.C. 500, 193 S.E. 36, 39.

See also Able v. Equitable Life Assur. Society, 186 S.C. 381, 195 S.E. 652 and White v. Southern Ry. Co., 208 S.C. 319, 38 S.E.2d 111, 165 A.L.R. 988.

Next for consideration is defendant's claim of accord and satisfaction. This claim has its genesis in a conference held in the offices of the defendant on October 8, 1946. Prior thereto the plaintiff had been pressing defendant for payment of long past due premium installments on the policy. The conference followed in consequence of a letter written plaintiff by defendant's counsel on September 14, 1946. The letter, in part, reads as follows:

"My clients are still unable to follow through the plan adopted by which you arrived at the figure of approximately $14,000.00 that is claimed to be due. In any event, we have at least reached the conclusion that there is a very bad misunderstanding", etc. Ex. D–21. Then followed an invitation to the plaintiff to send Messrs. Ragsdale and Blanton to Hampton for a conference.

On October 8, 1946, the conference was held, Messrs. Ragsdale and Blanton representing the plaintiff and Mr. Shaw, its President, Dr. Jacobson, its Vice-President, Mr. Bauer, its Secretary and Treasurer, Mrs. Tebeau, its Claim and First Aid Department head, and Mr. Warren, its attor-

ney, representing the defendant. There is some disagreement among those who testified as to what transpired at the conference. Mr. Shaw contended that an agreement had been reached whereby the whole matter was settled and so did Mr. Bauer and Mr. Warren. Their testimony was to the effect that the parties had agreed that the defendant would pay the plaintiff all sustained losses (then not fully ascertained or agreed to), certain taxes and 13% of the sum of those items, and would waive any claim to a dividend on the policy, in full settlement of plaintiff's claimed premium. Dr. Jacobson testified that he did not recall enough of the conference to say what transpired. Mrs. Tebeau testified that it was her understanding that Messrs. Ragsdale and Blanton were to submit the proposed agreement for approval; and, additionally, she volunteered a statement of commendation of both Ragsdale and Blanton for the way they had acted. Mrs. Tebeau agreed with Messrs. Ragsdale and Blanton who testified that they had no authority to make a setlement and that all they had agreed to do was to submit the proposed plan of compromise settlement to the executive officers of the plaintiff for acceptance or rejection, with their recommendation that it be accepted.

I do not find it necessary to pass on the factual differences between the two sets of witnesses. Under the terms of the contract plaintiff's agent had no authority to effect a binding settlement without the ratification or approval of plaintiff's president or secretary. Pertinent and, as I think, controlling provisions of the policy read as follows:
"South Carolina State Endorsement

\*　　\*　　\*　　\*　　\*　　\*

7. This policy is issued by the Company and is accepted by this employer with the agreement that the rates of premium are subject to modification in accordance with the rate manual and rating plans established and definitely made applicable to this policy by the South Carolina Compensation Rating Bureau and approved by the Commissioner of Insurance of the State of South Carolina, such modification, if any, to be expressed by endorsement naming the effective date thereof."

Also:
"L—Alterations And Changes In Policy

"No condition or provision of this policy shall be waived or altered except by endorsement attached hereto signed by the president and secretary of the Company, nor shall knowledge possessed by any representative, or by another person, be held to effect a waiver or change in any part of this contract. \* \* \*"

The premium terms of the policy are "in accordance with the rate manual and rating plans established and definitely made applicable to this policy by the South Carolina Compensation Rating Bureau and approved by the Commissioner of Insurance." The agreement which the defendant claims was effected on October 8, 1946, had it been accepted, would have been in violation of the rating plans established by the Compensation Rating Bureau and approved by the State's Commissioner of Insurance. Furthermore, as shown above, Messrs. Ragsdale and Blanton, agents of the plaintiff, had no authority to alter or waive the terms and conditions of the policy contract. That could be done only by an endorsement attached to the policy and signed by plaintiff's president and secretary. The policy had long since run its full course before the mentioned conference was held. Every liability under it that could arise had already arisen in accordance with the Workmen's Compensation Law of South Carolina, Code 1942, § 7035-1 et seq., under which the policy was written. The plaintiff could not be relieved from liability to legitimate claimants by any agreement between plaintiff and defendant. Any attempt so to relieve the plaintiff of liability to legitimate claimants would have been null and void.

Plaintiff's premium was liquidated. The amount due as premium on the policy was exactly determinable by the contract creating the obligation to pay it. "The payment of a sum smaller than a liquidated debt in pursuance of an agreement not under seal to accept such sum in satisfaction cannot be satisfaction of the whole. Such payment notwithstanding the agreement operates only as a payment pro tanto." Ex Parte Zeigler, 83 S.C. 78, 64 S.E. 513, 514, 916, 21 L.R.A.,N.S., 1005. This doctrine

was reaffirmed in Parker v. Mayes, 85 S.C. 419, 67 S.E. 559, 560, 137 Am.St.Rep. 912; and Davis & Broadway v. Barwick, 88 S.C. 355, 70 S.E. 1007, 1008. See also Strange v. Gulf Refining Co., 142 S.C. 102, 140 S.E. 307.

Leaving out of consideration the denial of such authority in the policy contract, there is meager, if any, testimony to establish authority in plaintiff's agents to make the claimed compromise settlement; and there is a total absence of evidence of ratification. And, since such a settlement would have been in derogation of state law, authority to make it is not to be lightly inferred. Certainly authority to accept payment in full settlement of an account does not imply authority to settle it for an amount less than the sum due. Defendant's claim of accord and satisfaction cannot be sustained.

■■ In connection with both this defense and the defense of fraud, I would emphasize again the fact that under South Carolina law there can be no effective workmen's compensation insurance rates or rating plans other than those filed with and approved by the State Insurance Commissioner. The right to fix such rates by contract has been taken away from the insurer and the insured by the Legislature and the making of uniform rates for all employers has become a function of the State Government. Thus, even had the plaintiff's agents agreed with the defendant to provide it with workmen's compensation coverage at either the October 1944 conference or the October 1946 conference under the premium plan which defendant claims was contemplated, such agreement would be ineffective because at variance with the premium plans approved and published by the State. If this were not true, the door would be open to all manner of rate discrimination and rebates in violation of State law. Sections 7035-76 and 7994 of the 1942 Code. Cf. Pressley v. Pilot Life Ins. Co., 186 S.C. 209, 195 S.E. 332; Pilot Ins. Co. v. Peebles, 191 S.C. 486, 5 S.E.2d 174.

Courts of other jurisdictions have held consistently that when insurance rates are fixed by a state agency, contracts providing for different rates are unenforcible. Great American Indemnity Co. v. Abbott Glass Co., 149 Misc. 437, 267 N.Y.S. 523; Peabody, Jr., & Co., v. Travelers Ins. Co., 240 N.Y. 511, 148 N.E. 661, 42 A.L.R. 1090; Employers Liability Corp. v. Success-Uncle Sam Cone Co., 124 Misc. 614, 208 N.Y.S. 510. The rule is analogous to that which makes rates for common carriers set by State or Federal agencies inviolable and not subject to change by the carrier and the shipper regardless of the equities existing between them. White v. Southern Ry. Co., 208 S.C. 319, 38 S.E.2d 111, 165 A.L.R. 988; Central R. R. Co. of New Jersey v. Mauser, 241 Pa. 603, 88 A. 791, 49 L.R.A.,N.S., 92.

■ In arriving at the figures to be included in their stipulation of November 22, 1948, the parties have been guided by my conclusion that defendant was entitled to a dividend despite the fact that it is paying this premium only under the judgment of the Court, but that attorney's fees and Court Costs incurred by the plaintiff in making collection of the premium must be deducted from the dividend. I should therefore briefly express my views as to these matters.

As to dividends, the policy WC-272669-E provides: "The employer (the defendant herein) is a member of the Company (the plaintiff herein) and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined."

On July 18, 1945, while the policy was in force, the Board of Directors of plaintiff declared a dividend of 20% of the computed premium on policies terminating within the period of October 1, 1945, to October 30, 1945, and provided that no premium should be payable "until the policyholder * * * shall have complied with the terms of his policy * * * as respects the payment of premium and that the amount * * * shall be reduced by attorneys' fees, court costs and other unusual expense incurred * * * in effecting collection of amounts due on such policy * * *."

The plaintiff contends that the defendant is not entitled to the declared dividend for the reason that it has not fully paid the premium due on the policy. I do not agree. The contract provides that the employer, here the defendant, "shall participate * * *

in the distribution of dividends," "to the extent and upon the conditions fixed \* \* \* by the Board of Directors". The extent of the dividend, as declared by the Board, is "20% on the premiums as computed in accordance with the terms of such policies". The conditions are that the policy holder shall receive the dividend due and have deducted therefrom any "attorneys' fees, court costs and other unusual expense incurred by the Company (plaintiff) in effecting collection of amounts due on such policy \* \* \*." It is utterly illogical to say that there is no dividend and in the same breath that something shall be deducted from it. Attorneys' fees, court costs and other expenses incurred in an effort to defeat liability for the dividend should, of course, not be deducted.

When counsel, for the purpose of making their stipulation of November 22, 1948, asked my opinion as to a proper amount of attorneys' fees and costs to be deducted from the 20% dividend due to defendant here, I suggested that a fee of Three Thousand Dollars would be appropriate. In making this suggestion I was considering only the services rendered by plaintiff's counsel in collecting the premium and not their services in defeating defendant's counterclaim. Had the value of counsel's services in the entire case been for my determination, I would have considered a fee of Six Thousand Dollars reasonable in view of the novelty and importance of the legal questions presented, the amount of highly detailed work involved and the results accomplished.