James C. GRIFFIN, Jr. and Eugenia
Griffin, Plaintiffs,

v.

Reginald D. HEINITSH, Defendant.

Civ. A. No. 69–51.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 30, 1970.

———◆———

Jack F. McGuinn, Columbia, S. C., for plaintiffs.

E. Ellison Walker, McKay, McKay, Black, Sherrill, Walker & Wilkins, Columbia, S. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW and ORDER

DONALD RUSSELL, District Judge.

This is a suit to recover damages for fraud and deceit, arising out of the purchase by plaintiffs of a lot at a mountain real estate development in Pickens County, South Carolina. It was tried before me without a jury in Columbia, South Carolina. After taking the testimony, arguments were had and opportunity given the parties to file written briefs. Briefs have been filed and upon a consideration of the record and the briefs of the parties, I make the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Sometime prior to 1960, the defendant, at that time a resident of Columbia, South Carolina, and Charles D. Davis, an attorney of Columbia, South Carolina, formed a corporation under the laws of South Carolina, styled Construction Loan and Mortgage Co. of South Carolina, for the purpose of developing a low-cost mountain resort, real estate development, owned by it in Pickens County, South Carolina, under the trade name "MOUNTAIN LAKE ESTATES". At least during the early years, when the plaintiffs purchased their lot as hereinafter detailed, the active development of the project and the management of the corporation were handled by Davis.

2. The corporation platted the property and divided the area in one-half acre lots. The lots were priced at $600 and were to be sold on time, under contracts to give a deed, payable "Ten Dollars ($10.00) at the signing of this contract and the further payment of Ten Dollars ($10.00) per month", with interest at 6% (deeds to be given upon completion of payment). It issued a "Sales Prospectus" describing the lots as providing a "mountain estate, located near a beautiful mountain lake with boating, swimming and fishing privileges". It, also, referred to "picnic areas". The "Prospectus" included the statement that, "If you (the purchaser) are not completely satisfied and will notify us within thirty days, your money will be cheerfully refunded". The "Prospectus" had a map on the back indicating how to reach the development. On the side of the map were the words, "Paved Road to Entrance from Pickens".

3. The Construction Loan and Mortgage Company made substantial investments in developing the property. It built a lake, constructed a bath house adjacent to the lake, prepared picnic areas, and put topsoil on the roads. These were not elaborate developments but, after all, it was not an elaborate development. To a substantial extent, the improvements to the subdivision were financed through a loan from the Citizens & Southern National Bank of South Carolina, endorsed by the defendant and Davis and secured by an assignment of all the contracts of sale received by the Company and by a mortgage over the development itself.

4. I find that the corporation substantially complied with the representations made by it in its "Prospectus" with reference to the development of the property.

5. The plaintiffs, who live in and are residents of Columbia, South Carolina, became interested in the purchase of a lot in the subdivision as a result of the

"Prospectus".[1] They visited the property and talked personally to Mr. Davis. The plaintiff James C. Griffin, Jr. thereupon, on July 17, 1960, entered into a contract to purchase a lot selected by him and his wife in the subdivision for the agreed purchase price of $695. He made the down-payment of $10 and made the monthly payments thereafter as required by his contract of purchase.

6. The roads in the subdivision apparently represented a problem of maintenance. The record shows that either the defendant or his predecessor in title sought to keep the roads in usable condition. They placed "topsoil" on the roads on at least two occasions. However, the sale of lots was slow. Practically no homes were built in the subdivision. The roads in the subdivision were accordingly used, if at all, sparingly. Unused, the roads did deteriorate. As a result of the financial demise of the developing corporation, the roads fell into disrepair and became at times practically unusable. However, this was not by design on the part of the developing corporation. It had undoubtedly expected considerable development and, with the transfer of the roads to the County, it had anticipated that the County would maintain the roads. The failure of the subdivision to succeed as anticipated prevented this development. But such failure was not the result of any fraud on the part of either the promoting corporation or of the defendant. It was a hazard that should have been anticipated by both the promoters of the subdivision and by the plaintiffs.

7. The development did not prosper. Construction Loan and Mortgage Company defaulted on its loan with the bank. The defendant was called on his indorsement. As a consequence, he purchased from the bank sometime in 1965, the note held by the bank, taking an assignment of the security. He foreclosed the mortgage and took title to the property of the Construction Loan and Mortgage Company. He, also, took over the unpaid portions of the contracts of sale. When final payment was made on a contract of sale, he proceeded to deliver a deed to the purchaser as provided in the contract of sale.

8. The plaintiff's wife, after the defendant had acquired by foreclosure the property, expressed in a letter to the defendant dated October 14, 1965, some disappointment with the purchase and referred to the fact that while "When we (meaning her husband and herself) first visited Mountain Lake we were told that roads were to be paved and other improvements made," they had, on a recent visit, been unable to use the road. She inquired specifically whether a trade of the lot at Mountain Lake could be made for one at Lake Toxaway, which was a real estate development being promoted by the defendant.

9. Plaintiff James C. Griffin, Jr. completed his payments in January, 1968, and on January 17, 1968, he was given a deed to the lot he had purchased by the defendant. On October 29, 1968, plaintiff James C. Griffin, Jr. wrote the defendant, complaining that the subdivision "has not been developed". He accordingly offered the property back to the defendant "for my money ($695.00) plus interest ($155.69) totaling $850.69." Defendant replied that the property had been sold by him but added, "I am told that development will proceed."

10. Neither in the contract of sale nor in the deed is there any statement of any obligation on the part of the grantor with respect to the maintenance of or even the use of the roads in the subdivision. The roads were, however, delineated on a map of the subdivision as filed in the official records of Pick-

---

1. The plaintiffs refer to some of the vivid language in the "Prospectus", especially the description of the subdivision as a "wonderland vacation spot". Cf., however, the language of the Court in Columbia Sav. Bank & Trust Co. v. True, et al.

(1917) 108 S.C. 56, 60, 93 S.E. 389:
   "Both were men of experience, and should have known that too much credence should not be given to the statement made by a real estate agency in offering property for sale."

ens County. The contract of sale did include a specific statement of the right of all lot owners to use the lakes in the subdivision.

11. On November 4, 1968, the plaintiff James C. Griffin, Jr. wrote the defendant that he demanded complete rescission of his purchase, with a refund of all payments, made by him, with interest. He added that, unless such repayment was had "no later than Saturday, November 9, 1968", he would turn the matter over to his attorney, who, he said, had advised him that his "rights are both civil and criminal in view of the false representation of developing the property *inducing the contract*". (Italics added)

To this letter, the defendant replied on November 12, 1968. He restated that the Mountain Lake Estates was "nonexistent", but affirmed that he had fulfilled "any responsibility I (he) had and personally deeded all lots to the owners when the lots were paid for". He disclaimed any knowledge of "what you (the plaintiff) were told to constitute any misrepresentation" but emphasized that, as he understood it, the selling corporation had done all intended "when the lots were properly surveyed, when the roads were dedicated to the county and when the lake was built." He concluded with the observation that any lawsuit would be "putting both of us to a lot of expense for nothing".

The plaintiff promptly replied on November 14, 1968, requesting information in connection with the dissolution of Mountain Lake Estates, and particularly inquiring whether the County had accepted the roads. He closed with the statement: "If the roads were accepted by them (the County) I can envision an altogether different situation; however, if these roads were not accepted by them, is this a further effort to mislead us."

12. Apparently offended by the tone of the letter of November 14, the defendant, in a hand-written note dated November 19, 1968, suggested that, in view of the plaintiff's attitude, the plaintiff should find out for himself the answer to his inquiries, "since you (the plaintiff) won't accept my word."

13. With this note, communication between the parties ended and this suit was commenced, seeking both actual and punitive damages in the sum of $25,000. In their complaint, the plaintiffs alleged specially that the "Prospectus", on the basis of which they claim to have made their purchase, stated that "paved roads to the entrance of the development were to be maintained and roadways from the 'wonderland vacation spot' were to be maintained in perpetuity".

## CONCLUSIONS OF LAW

1. There is the requisite diversity of citizenship and amount in controversy to sustain the jurisdiction of this Court under Section 1332, 28 U.S.C. See, Order entered May 29, 1969, in this cause.

2. The standard definition of actionable fraud, under the law of South Carolina, is a "false representation of fact, made with knowledge of its falsity, or recklessly, without belief in its truth, with the intention that it shall be acted upon by the complaining party, and actually inducing him to act upon it to his injury." Thompson v. Bass (1932) 167 S.C. 345, 357, 166 S.E. 346.

3. The main complaint of the plaintiffs centered on the roads to and in the development. They contend in their complaint that the "Prospectus" represented that there was a "paved road" from Pickens to the entrance of the development and that "roadways from" the development were "to be maintained in perpetuity". In the letter of the plaintiff Eugenia Griffin written in 1965, reference is made to some representation "that roads were to be paved". And in November, 1968, after plaintiff James C. Griffin, Jr. had taken title to his lot, he stated that if the roads in the subdivision had been accepted by the County, that creates "an altogether different situation". It is thus plain that plaintiffs' claim of fraud rests on two alleged misrepresentations: (1) That the road from Pickens to the entrance of the sub-

division was paved; and (2) That the roads within the subdivision were "to be maintained in perpetuity" or "to be paved". These two claims will be considered separately.

■■ 4. The first claim of misrepresentation rests on the circumstance that, on the back of the "Prospectus", there was a map indicating the general location of the subdivision, on which the words "Paved Road to Entrance from Pickens" appeared. Assuming that this was sufficient to constitute a representation that the road from Pickens to the entrance was paved, it represented a representation of an existing fact, observable by any one who visited the subdivision. Before entering into a contract to purchase a lot at the subdivision, the plaintiffs drove to the subdivision and inspected the property. It was only after such personal inspection that the plaintiff James C. Griffin, Jr. entered into his contract of purchase. He had ample opportunity for himself to determine whether the road from Pickens was paved; in fact, it is difficult, if not impossible, to understand how he could have avoided seeing, at that time, whether the road was paved. Certainly, neither the plaintiffs nor anyone connected with the initial development of the subdivision did anything to prevent the plaintiffs from ascertaining the condition of the public highway leading to the subdivision, on which the plaintiffs no doubt traveled when they visited the subdivision. With these opportunities to determine for themselves the truth of the representation, undeterred by any act of the defendant or his predecessor in title, the plaintiffs had no right to rely on the developer's representation, if the words added to the map constituted a representation, and could base no right of action in fraud thereon. See Mobley v. Quattlebaum (1915) 101 S.C. 221, 234–235, 85 S.E. 585; Hester v. New Amsterdam Casualty Company (D.C.S. C.1968) 287 F.Supp. 957, 977, rev. on other grounds, 412 F.2d 505. Moreover, it would appear from the record that the road in question was paved and that the statement on the back of the "Prospectus" was not a false representation. Nor does it appear that there was the slightest intent on the part of the developer of the subdivision to mislead the plaintiffs or any other prospect on this point. The "Prospectus" emphasized that any prospect should visit the property before buying and even included an offer to rescind if a purchaser chose to do so within thirty days after his purchase. This rebuts any idea that the developer was seeking to mislead anyone about the condition of the highway from Pickens to the subdivision. No right of action in fraud can be founded on any claim of misrepresentation about the condition of the highway from Pickens to the entrance of the subdivision.

5. Turning now to the claim of misrepresentation in connection with the roads within the subdivision, it should be noted at the outset that there is no representation in the "Prospectus", as the complaint alleges, that such roads would be "maintained in perpetuity". In fact, the "Prospectus" includes no reference whatsoever to roads within the subdivision. The plaintiffs contend, however, that when they visited the subdivision in advance of purchasing their lot, they were given to understand that the roads in the development would be maintained. The exact nature of this statement is not entirely clear in the record.

It is only fair to point out that the developer or the defendant, or both, did make efforts to keep the road in reasonable repair. There was evidence that they had placed topsoil on the roads on at least two occasions. It must be remembered, however, that this was mountainous terrain and the maintenance of roads in such an area is not easy.

In any event, though, it was a promise of future action and not a representation of an existing fact. Bare statements dealing with future maintenance of the roads or representing promises of future action would not support plaintiffs' action.

It is settled that fraud may not be based on statements promissory in character. Holmes v. Caldwell (1857) 10 Rich. 311, 317; Greer Bank & Tr. Co. v. Waldrop (1930) 155 S.C. 47, 53, 151 S.E. 920; United Merchants & Mfrs. v. South Carolina El. & G. Co. (D.C. S.C. 1953), 113 F.Supp. 257, 264, aff. 208 F.2d 685; Classic Bowl, Inc. v. AMF Pinspotters, Inc. (7th Cir. 1968) 403 F.2d 463, 466; Sutro Bros. & Co. v. Indemnity Insurance Co. of North America (D.C.N.Y.1967) 264 F.Supp. 273, 288, aff. 386 F.2d 798. Only where there is evidence of a present intention not to fulfil the promise or where the promise of future action is made in bad faith can actionable fraud be predicated on a promise of future action. Schenley Distillers Corporation v. Renken (D.C. S.C.1940) 34 F.Supp. 678. Thus, a promise of permanent future employment will not support an action for fraud. Craig v. Texaco, Inc. (D.C.N.C. 1963) 218 F.Supp. 789, aff. 326 F.2d 971. There is a complete absence of any evidence in this case that either the defendant or his predecessor in title made any promises they intended not to perform.

Moreover, it must be observed that the representations made to induce the purchase by the plaintiffs were made by a corporation, now defunct. It is true that the defendant was an officer and a stockholder of that corporation. It is undisputed, though, that during the time the plaintiffs made their purchase, the active officer of the corporation and the one in charge of its operations was Mr. Davis and not the defendant. And the mere fact that the defendant was an officer and substantial stockholder will not make him personally responsible for the acts of the corporation, absent some showing to justify piercing the corporate veil and showing that the corporation was the mere *alter ego* of the defendant. The plaintiffs have undertaken no such burden. Such representations as plaintiffs claim thus represent matters for which the corporation was responsible and for which, under this record no responsibility can attach to the defendant.

The only representation that could be attributed to the defendant himself would be those made after he had foreclosed on the property and taken an assignment of the contracts of purchase. At most, his representation was that the roads within the subdivision "were dedicated to the County". Of course, a valid dedication of the roads would require acceptance, express or implied, by the County. Hodge v. Manning (1962) 241 S.C. 142, 150, 127 S.E.2d 341. This statement, however, was made after the plaintiff James C. Griffin, Jr. had completed his purchase and had taken title to his lot. It thus did not induce him either to purchase his lot or to continue payments under his contract of purchase. Moreover, the defendant had deeded the roads to the County and it is reasonable that he understood that he had thereby dedicated the roads to the County.

There were no other representations that were made that were not observed. The mere fact that the development did not result in that "wonderland" that both its promoters and its homeowners expected does not mean that the promoters were guilty of fraud. The promoter built the lakes it promised, it laid out the roads, it provided the picnic grounds. That the public did not rush to develop the subdivision by purchasing lots and building houses is not an unusual situation in real estate development. It was one that should have been as much in the anticipation of the plaintiffs as of the promoter of the subdivision.

Finally, the plaintiffs assert fraud on the part of the defendant because of a violation of Section 45–4, Code of Laws of South Carolina (1962). This section prohibits a sale and conveyance of property under lien without notifying the purchaser of such lien. The person whose act is condemned is one "who shall wilfully and knowingly *sell and convey* any real or personal property on which any lien exists". (Italics add-

ed.) The crime consists of not simply selling the property; actually the important act is the conveying of the property, the completion of the sale. See State v. Johnson (1884) 20 S.C. 387, 391. There is no proof that at the time the defendant conveyed the lot in question to the plaintiff James C. Griffin, Jr. there was any outstanding lien thereon. The mortgage had already been released, so far as this lot was concerned. The statute is accordingly inapplicable.

I conclude that there is no basis for a claim of actionable fraud against the defendant in this action.

The complaint is accordingly dismissed, with costs divided between the parties.

And it is so ordered.